A-11 (rev. 7/00)

Page 1 of 2



| USCA DOCKET # (IF KNOWN) |
|---|
| 16-55425 |

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
## CIVIL APPEALS DOCKETING STATEMENT

PLEASE ATTACH ADDITIONAL PAGES IF NECESSARY.

| TITLE IN FULL: | DISTRICT: CENTRAL | | JUDGE: Jesus G. Bernal |
|---|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC.; DOE 1, a minor by and through his/her guardian; DOE 2, and DOE 2 individually; DOE 3 and DOE 4, Plaintiffs/Appellees v. CHINO VALLEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION; and ⊞ | DISTRICT COURT NUMBER: EDCV 14-2336-JGB (DTBx) | | |
| | DATE NOTICE OF APPEAL FILED: Mar 16, 2016 | IS THIS A CROSS APPEAL? ☐ YES | |
| | IF THIS MATTER HAS BEEN BEFORE THIS COURT PREVIOUSLY, PLEASE PROVIDE THE DOCKET NUMBER AND CITATION (IF ANY): | | |

**BRIEF DESCRIPTION OF NATURE OF ACTION AND RESULT BELOW:**

Please see Attachment "A"

**PRINCIPAL ISSUES PROPOSED TO BE RAISED ON APPEAL:**

Please see Attachment "B"

**PLEASE IDENTIFY ANY OTHER LEGAL PROCEEDING THAT MAY HAVE A BEARING ON THIS CASE (INCLUDE PENDING DISTRICT COURT POST-JUDGMENT MOTIONS):**

**DOES THIS APPEAL INVOLVE ANY OF THE FOLLOWING:**

☐ Possibility of Settlement
☐ Likelihood that intervening precedent will control outcome of appeal
☐ Likelihood of a motion to expedite or to stay the appeal, or other procedural matters (Specify)

☐ Any other information relevant to the inclusion of this case in the Mediation Program

☐ Possibility parties would stipulate to binding award by Appellate Commissioner in lieu of submission to judges

## LOWER COURT INFORMATION

| JURISDICTION | | DISTRICT COURT DISPOSITION | |
|---|---|---|---|
| FEDERAL | APPELLATE | TYPE OF JUDGMENT/ORDER APPEALED | RELIEF |

**JURISDICTION**

**FEDERAL**
- [x] FEDERAL QUESTION
- [ ] DIVERSITY
- [ ] OTHER (SPECIFY):

**APPELLATE**
- [x] FINAL DECISION OF DISTRICT COURT
- [ ] INTERLOCUTORY DECISION APPEALABLE AS OF RIGHT
- [ ] INTERLOCUTORY ORDER CERTIFIED BY DISTRICT JUDGE (SPECIFY):
- [ ] OTHER (SPECIFY):

**DISTRICT COURT DISPOSITION**

**TYPE OF JUDGMENT/ORDER APPEALED**
- [ ] DEFAULT JUDGMENT
- [ ] DISMISSAL/JURISDICTION
- [ ] DISMISSAL/MERITS
- [x] SUMMARY JUDGMENT
- [ ] JUDGMENT/COURT DECISION
- [ ] JUDGMENT/JURY VERDICT
- [ ] DECLARATORY JUDGMENT
- [ ] JUDGMENT AS A MATTER OF LAW
- [ ] OTHER (SPECIFY):

**RELIEF**
- [ ] DAMAGES:
  - SOUGHT $
  - AWARDED $
- [ ] INJUNCTIONS:
  - [ ] PRELIMINARY
  - [ ] PERMANENT
  - [ ] GRANTED
  - [ ] DENIED
- [x] ATTORNEY FEES:
  - SOUGHT $
  - AWARDED $
- [x] PENDING
- [x] COSTS: $

## CERTIFICATION OF COUNSEL

I CERTIFY THAT:

1. COPIES OF ORDER/JUDGMENT APPEALED FROM ARE ATTACHED.

2. A CURRENT SERVICE LIST OR REPRESENTATION STATEMENT WITH TELEPHONE AND FAX NUMBERS IS ATTACHED (SEE 9TH CIR. RULE 3-2).

3. A COPY OF THIS CIVIL APPEALS DOCKETING STATEMENT WAS SERVED IN COMPLIANCE WITH FRAP 25.

4. I UNDERSTAND THAT FAILURE TO COMPLY WITH THESE FILING REQUIREMENTS MAY RESULT IN SANCTIONS, INCLUDING DISMISSAL OF THIS APPEAL.

| s/Robert H. Tyler | Mar 31, 2016 |
|---|---|
| **Signature** | **Date** |

## COUNSEL WHO COMPLETED THIS FORM

| NAME | Robert H. Tyler | | |
|---|---|---|---|
| FIRM | Tyler & Bursch, LLP | | |
| ADDRESS | 24910 Las Brisas Road, Suite 109 | | |
| CITY | Murrieta | STATE California | ZIP CODE 92562 |
| E-MAIL | rtyler@tylerbursch.com | TELEPHONE (951) 600-2733 | |
| FAX | (951) 600-4996 | | |

**\*\*THIS DOCUMENT SHOULD BE FILED IN DISTRICT COURT WITH THE NOTICE OF APPEAL. \*\***
**\*\*IF FILED LATE, IT SHOULD BE FILED DIRECTLY WITH THE U.S. COURT OF APPEALS.\*\***

## Attachment "A"

On October 17, 2013, the Chino Valley School District Board adopted a resolution permitting an invocation or prayer to solemnize the beginning of school board meetings. The Resolution specified that the invocation or prayer was not to be part of the official minutes of the Board meeting, was to be voluntary, and was to be given by an "invocational speaker" selected from the community's diverse religious leaders and clergy on a rotating basis. To ensure that all religious backgrounds were represented, the Resolution also mandated that no single person lead the invocation for consecutive meetings and not more than three times per year.  The Resolution's express purpose was not to "express the Board of Education's preference for any faith or religious denomination" instead the purpose of the Resolution was to respect the "diversity of religious denominations and faiths represented and practiced among the citizens who reside in the Chino Valley Unified School District."

Following the Resolution an invocation or prayer would solemnize the beginning of school board meetings. At times the invocation or prayer would be led by members of the School Board.

The District Court granted Summary Judgment in favor of Plaintiffs finding that invocations before school board meetings were not subject to the Legislative Prayer Exception, and that the Resolution violated the Establishment Clause.

## Attachment "B"

The Principal Issues on Appeal are:

1.   Did the District Court err when it found that Plaintiffs had standing?

2.   Did the District Court err when it found that the School Board Member Defendants, sued in their individual representative capacities, were not entitled to legislative immunity?

3.   Did the District Court err when it found that the School Board Member Defendants, sued in their individual representative capacities, were not entitled to immunity under the Eleventh Amendment?

4.   Did the District Court err when it found that invocations prior to meetings of a politically elected school board did not qualify for the Legislative Prayer Exception?

5.   Did the District Court err when it found that a facially religiously neutral resolution did not have a secular purpose?

6.   Did the District Court err when it found that a religiously neutral resolution endorsed religion?

7.   Did the District Court err when it declared that the Resolution permitting prayer prior to Board meetings violated the Plaintiff's first amendment rights?

8.   Did the District Court err when it enjoined the School Board Members from permitting prayer at school Board meetings, even from members of the public?

9.   Does the District Court's injunction prohibiting members of the public from expressing religious viewpoints during the public comment period of school board meetings violate the Free Speech Clause?

10.  Does enjoining all religious speech at school board meetings violate the Establishment Clause?

11.  Does enjoining all religious speech at school board meetings violate the Free Exercise Clause?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 14-2336-JGB (DTBx)** | Date | February 18, 2016 |
|---|---|---|---|
| Title | *Freedom From Religion Foundation, Inc., et al. v. Chino Valley Unified School District Board of Education, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) GRANTING IN PART Plaintiffs' Motion for Summary Judgment; and (2) DENYING Defendants' Motion for Summary Judgment (IN CHAMBERS)**

Before the Court are two motions for summary judgment: A Motion for Summary Judgment filed by Plaintiffs Freedom From Religion Foundation, Inc., et al., ("Plaintiffs"), and a Motion for Summary Judgment filed by Defendants Chino Valley Unified School District Board of Education ("Board of Education" or "Board"), and James Na, Sylvia Orozco, Charles Dickie, Andrew Cruz, and Irene Hernandez-Blair, members of the Board of Education in their official representative capacities (collectively, "Defendants"). After considering the papers filed in support of and in opposition to the Motions, the Court GRANTS IN PART Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment.

## I. BACKGROUND

On November 13, 2014, Plaintiffs filed this action against Defendants Board of Education, and James Na, Sylvia Orozco, Charles Dickie, Andrew Cruz, and Irene Hernandez-Blair, members of the Board of Education in their official representative capacities, alleging that Defendants violated the Establishment Clause of the First Amendment by instituting a policy and practice of prayer in the Chino Valley District's school board meetings. Plaintiffs seek a declaratory judgment that Defendants' conduct of prayers, Bible readings, and proselytizing at Board meetings violate Plaintiffs' rights under the Federal and California constitutions, a permanent injunction enjoining the Board and its members from continuing to violate Plaintiffs' constitutional rights, and nominal damages for past constitutional violations.

Plaintiffs filed a First Amended Complaint on December 15, 2014. ("FAC," Doc. No. 20.) On September 28, 2015, Plaintiffs filed a Motion for Summary Judgment. (Doc. No. 48). Plaintiffs filed the following documents in support of the motion:

- Memorandum of Points and Authorities, ("Pls.' MSJ," Doc. No. 48-1);

- Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law, ("SUF," Doc. No. 48-2);

- Declaration of Michael Anderson, ("First Anderson Decl.," Doc. No. 48-3), attesting to Exhibits 1-15 ("DVD," Doc. No. 51);

- Declaration of Larry Maldonado, ("First Maldonado Decl.," Doc. No. 48-3);

- Declaration of David J. Kaloyanides, ("Kaloyanides Decl.," Doc. No. 48-3), attesting to Exhibits 16 through 45, 52 and 53, (Doc. Nos. 49, 49-1, 50); and

- Plaintiffs' Request for Judicial Notice, (Doc. No. 52).

On October 5, 2015, Defendants opposed Plaintiffs' MSJ, ("Defs.' Opp'n," Doc. No. 59), and filed the following documents in support of their Opposition:

- Defendants' Statement of Genuine Disputes, ("DSGD," Doc. No. 60);

Plaintiffs replied on October 18, 2015, ("Pls.' Reply," Doc. No. 70), and submitted the following documents in support:

- Supplemental Declarations Filed Under Seal (Doc. Nos. 69, 71).[1]

On October 19, 2015, Defendants filed an Objection to Plaintiffs' late-filed supplemental declarations. (Doc. No. 73.)

On October 2, 2015, Defendants cross-moved for summary judgment. ("Defs.' MSJ," Doc. No. 57.) Defendants filed the following documents in support of their Motion:

- Declaration of Michael J. Peffer, ("Peffer Decl.," Doc. No. 58-1)[2], attesting to Exhibits A and B, (Doc. No. 58-1).

- Defendants' Statement of Uncontroverted Facts and Conclusions of Law, ("DSUF," Doc. No. 57-2);

---

[1] Plaintiffs' First, Second and Third set of Declarations were filed under seal pursuant to a protective order issued by this Court on April 15, 2015, (Doc. No. 30).

[2] Defendants initially filed the Declaration of Michael Peffer without the attached exhibits. (Doc. No. 57-1.) Defendants later filed a Notice of Errata with an amended declaration and attached Exhibits A and B. (Doc. No. 58-1.)

Plaintiffs opposed Defendants' Motion for Summary Judgment on October 12, 2015. ("Pls.' Opp'n," Doc. No. 66.)  Plaintiffs filed the following documents in support of their Opposition:

- Plaintiffs' Statement of Genuine Disputes, ("PSGD," Doc. No. 67).

- Plaintiffs' Objections to the Peffer Declaration, ("Pls.' Objections," Doc. No. 68).

Defendants replied on October 19, 2015.  ("Defs.' Reply," Doc. No. 72.)  On October 5, 2015, Defendants filed a Request for Judicial Notice in support of their cross-Motion for Summary Judgment and their Opposition to Plaintiffs' Motion for Summary Judgment, (Doc. No. 61).

The Court held a hearing on the Motions on November 16, 2015.  At the hearing, the Court ordered supplemental briefing on the issue of standing.  On November 23, 2015, Plaintiffs submitted supplemental briefing ("Pls.' Supp. Briefing," Doc. No. 78) and supplemental declarations filed under seal (Doc. Nos. 78-1, 79).  On December 2, 2015, Defendants filed supplemental briefing ("Defs.' Supp. Briefing," Doc. No. 81), and objections to Plaintiffs' supplemental declarations (Doc. No. 81-1).  Plaintiffs filed a response to Defendants' objections on December 3, 2015.  (Doc. No. 85.)

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate its entitlement to summary judgment.  See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325.  Instead, the moving party's burden is met by pointing out an absence of evidence supporting the non-moving party's case.  Id.  The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256.  The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252; see also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial, 14:144.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir.

2010) (citing Anderson, 477 U.S. at 252).  "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue."  Id. at 387 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

If the moving party bears the burden of proof at trial, it "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); see also Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.").  Instead, Rule 56 requires the moving party to show it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Anderson, 477 U.S. at 250 ("[The summary judgment] standard mirrors the directed verdict standard under Federal Rule of Civil Procedure 50(a).").

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

## III. DISCUSSION

### A. Plaintiffs' Motion for Summary Judgment

#### 1. Undisputed Facts

The facts in this case are undisputed.  (DSGD at 2).  Except as noted, the following material facts are uncontroverted and sufficiently supported by admissible evidence.  They are "admitted to exist without controversy" for purposes of Plaintiffs' Motion for Summary Judgment. L.R. 56-3.

The Board is the governing body of the Chino Valley Unified School District.  (SUF ¶ 1). From June 27, 2013 through November 20, 2014, the Board was comprised of members James Na, Andrew Cruz, Sylvia Orozco, Irene Hernandez-Blair, and Charles Dickie.  (SUF ¶ 2).  A Student Representative also attends the meetings of the Board.  (SUF ¶ 20).

On October 17, 2014, the Board adopted Board Resolution 2013/2014-11 Enacting a Policy Regarding Invocations at Meetings of the Board (the "Resolution").  (SUF ¶ 4; Pls.' Ex. 19, Doc. No. 49; Pls.' Ex. 52, Doc. No. 49-1). The Resolution, reproduced in pertinent part, reads as follows:

> NOW, THEREFORE, BE IT RESOLVED by the Board of Education of the Chino Valley Unified School District, that the Board of Education does hereby adopt and establish the following written policy regarding opening invocations before meetings of the Board of Education:
>
> 1. In order to solemnize proceedings of the Board of Education, it is the policy of the Board of Education to allow for an invocation or prayer to be offered at its meetings for the benefit of the Board of Education and the community.

2. The prayer shall not be listed or recognized as an agenda item for the meeting so that it may be clear the prayer is not considered a part of the public business.

3. No member of the Board of Education or District employee or any other person in attendance at the meeting shall be required to participate in any prayer that is offered.

4. The prayer shall be voluntarily delivered by an eligible member of the clergy or a religious leader in the boundaries of the Chino Valley Unified School District. To ensure that such person (the "invocational speaker") is selected from among a wide pool of the District's clergy/religious leaders, on a rotating basis, the invocational speaker shall be selected according to the following procedure:

a. The Superintendent's designee shall compile and maintain a database (the "Congregations List") of the religious congregations with an established presence in the boundaries of the Chino Valley Unified School District.

b. The Congregations List shall be compiled by referencing the listing for "churches," "congregations," or other religious assemblies in the annual Yellow Pages telephone directory or directories published for the Chino Valley Unified School District, research from the Internet, and consultation with local chambers of commerce. All churches, congregations or other religious assemblies with an established presence in the boundaries of the Chino Valley Unified School District are eligible to be included in the Congregations List, and any such church, congregation or religious assembly can confirm its inclusion by specific written request to the Superintendent's designee.

c. The Congregations List shall also include the name and contact information of any chaplain who may serve one or more of the fire departments or law enforcement agencies within the boundaries of the Chino Valley Unified School District or any nearby military facilities.

d. The Congregations List shall be updated, by reasonable efforts of the Superintendent's designee, in November of each calendar year.

e. Within thirty (30) days of the effective date of this policy, and on or about December 1 of each calendar year thereafter, the Superintendent's designee shall mail an invitation addressed to the "religious leader" of each church, congregation or religious assembly listed on the Congregations List, as well as to the individual chaplains included on the Congregations List.

f. The invitation shall be dated at the top of the page, signed by the Superintendent's designee at the bottom of the page, and read as follows:

> Dear religious leader,
>
> The Board of Education makes it a policy to invite members of the clergy in the boundaries of the Chino Valley Unified School

District to voluntarily offer a prayer before the beginning of its meetings, for the benefit and blessing of the Board of Education. As the leader of one of the religious congregations with an established presence in the local community of the Chino Valley Unified School District, or in your capacity as a chaplain for one of the fire departments or law enforcement agencies within the boundaries of the Chino Valley Unified School District, you are eligible to offer this important service at an upcoming meeting of the Board of Education.

If you have an interest in providing an invocation, please send a written reply at your earliest convenience to the Superintendent's designee at the address included on this letterhead. Clergy are scheduled on a first come, first-serve, or other random basis. The dates of the Board of Education's scheduled meetings for the upcoming year are listed on the following, attached page. If you have a preference among the dates, please state that request in your written reply.

This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the Board of Education requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different from that of the invocational speaker.

On behalf of the Board of Education, I thank you in advance for considering this invitation.

Sincerely,

Superintendent's designee

g. Consistent with paragraph 7 hereof and, as the invitation letter indicates, the respondents to the invitation shall be scheduled on a first-come, first served, or other random basis to deliver the prayers.

h. If the selected invocational speaker does not appear at the scheduled meeting, the Board President may ask for a volunteer from among the Board or the audience to deliver the invocation.

i. The Superintendent's designee shall post the following information on the District's webpage: (i) this resolution, (ii) the Congregation List and (iii) the invitation set forth herein to churches, congregations and religious associations within the boundaries of the Chino Valley Unified School District.

5. No invocational speaker shall receive compensation for his or her service.

6. The Superintendent's designee shall make every reasonable effort to ensure that a variety of eligible invocational speakers are scheduled for the Board of Education meetings. In any event, no invocational speaker shall be scheduled to offer a prayer at consecutive meetings of the Board of Education or at more than three (3) Board of Education meetings in any calendar year.

7. Neither the Board of Education nor the Superintendent's designee shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker.

8. The Board President shall introduce the invocational speaker and the person selected to recite the Pledge of Allegiance and invite only those persons who wish to participate.

9. This policy is not intended, and shall not be implemented or construed in any way, to affiliate the Board of Education with, nor express the Board of Education's preference for, any faith or religious denomination. Rather, this policy is intended to acknowledge and express the Board of Education's respect for the diversity of religious denominations and faiths represented and practiced among the citizens who reside in the Chino Valley Unified School District.

NOW, THEREFORE, BE IT FURTHER RESOLVED that this policy shall become effective immediately upon approval by the Board of Education.

(SUF ¶ 4; Pls.' Ex. 52). The Resolution was approved, passed and adopted by unanimous vote of Board members Sylvia Orozco, James Na, Andrew Cruz, Irene Hernandez-Blair and Charles Dickie on October 17, 2013. (Id.)

The Board begins the open portion of its meetings with a prayer. (SUF ¶ 6). The opening invocation is usually delivered by a member of the clergy, however on some occasions, it has been delivered by a member of the Board, (SUF ¶¶ 38, 42, 73, 84, 97; Ex. 28, Minutes 06/12/2014; Ex. 32, Minutes 09/18/2014; Ex. 41, Minutes 04/02/2015).

In addition to the opening prayer, Board members have recited and read passages from the Bible at various points in the meetings. (SUF ¶¶ 31, 34-37, 40, 43, 48, 51, 55, 57, 60-61, 67, 70, 76, 78, 81, 85, 89). Comments of a religious nature by Board members at Board meetings include, but are not limited to the following:

- On October 3, 2013, Board member Andrew Cruz read "What is the Gospel" and said, "Christ died for our sins, according to the scripture, and that he was buried, and that he was raised on the third day, according to the scripture. Now that is the gospel." (SUF ¶ 36).

- On December 12, 2013, Board member Andrew Cruz told the audience, "But sin is one thing we should never need to look back on with feelings of failure. If we have confessed our sins and ask God's forgiveness, we simply need to keep a forward focus toward the goal of pleasing Christ." (SUF ¶ 43).

- On January 16, 2014, Board member James Na "urged everyone who does not know Jesus Christ to go and find Him." (SUF ¶ 49; Ex. 21, Minutes 01/16/2014 § V, at 43).

- On February 6, 2014, Board member Andrew Cruz stated, "You needed the right Board to follow that path. And I find that extraordinary. I think there are very few districts of that powerfulness of having a board such as ourselves having a goal. And that one goal is under God, Jesus Christ." He then read from the Bible, Psalm 143:8. (SUF ¶ 51).

- On February 20, 2014, Board member James Na thanked the pastor who delivered the invocation, saying, "Thank you Pastor Boyd for your serving the Lord Jesus Christ and serving all of our students because we do need your prayers daily basis [sic]." (SUF ¶ 54).

- The April 17, 2014 Board meeting was held at a Junior High School. (SUF ¶ 64). A prayer was given at that meeting. (SUF ¶ 63). At that meeting, Board member James Na told the audience, "And this one tells you how much we need God in our lives especially in today's society. And I would just like to thank God for sending his son Jesus Christ so our sins would be forgiven but have eternal hope, and we'll stay together as we were on this earth but in eternal life in heaven." (SUF ¶ 65).

- Also in a Junior High School, at the May 1, 2014 Board meeting, James Na told the audience, "We are all created in God's image. Each one of us are very, very special. There's no accidents that made us here or be here. We didn't choose to be born on this earth. We were sent." (SUF ¶ 69).

- On June 12, 2014, Board member James Na told the audience to live every day as your last day and to have hope in Jesus Christ. (SUF ¶ 74).

- On July 16, 2015, Board member Andrew Cruz addressed the audience regarding the Supreme Court's ruling on marriage equality, saying that the union between one man and one woman is "sealed in our hearts." He stated that children have a right and should be raised by their biological parents, and that the gender of parents matters for the healthy development of children. "Fathers cannot nurture children in the womb or give birth. Mothers' nurturing is an essence of God, unique beneficial, cannot be duplicated." (SUF ¶¶ 103-04).

Students are present at these meetings. (SUF ¶¶ 19, 26, 28, 106, 108). The student board member is part of the Board and is responsible for representing students' interests to the Board. (SUF ¶¶ 20, 28; Answer to FAC ¶ 69, Doc. No. 24). In addition to the Student Representative, students regularly attend meetings to address issues concerning schools in the District. (SUF ¶ 19). Students present to the Board directly following the prayer. (SUF ¶ 26). Presentations include musical performances, which often involve more than one student. (SUF ¶¶ 26-27). During this time, the Board also recognizes students' achievements. (SUF ¶ 26; Pls.' Ex. 24,

Case 5:14-cv-02336-JGB-DTB   Document 100   Filed 03/31/16   Page 13 of 36   Page ID
#:1480
Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 9 of 26   Page ID #:1232

Minutes 03/06/2014).  Student members of Junior ROTC attend Board meetings for the presentation of the colors, (SUF ¶ 106), and students have delivered the Pledge of Allegiance at Board meetings.  (SUF ¶ 21).  Students also attend Board meetings for disciplinary matters, which are handled in the closed session.  (SUF ¶ 108).  Meetings of the Board take place on school district property and are sometimes held in the schools.  (SUF ¶¶ 22-23, 64, 69).

Plaintiff Michael Anderson, a parent of two students, Does 1 and 2, has attended meetings of the Board, viewed broadcasts of the meetings and read minutes from meetings posted to the Board's website.  (SUF ¶¶ 7-9; First Anderson Decl. ¶¶ 1-2).  Every Board meeting he attended began with a prayer, the majority of which were overtly Christian.  (First Anderson Decl. ¶ 4).

Plaintiff Larry Maldonado, the parent of Doe 4, a student who attends school within the District, has attended several meetings of the Board and watched broadcasts of Board meetings on local television.  (SUF ¶¶ 12-13).  Plaintiff Maldonado's child attended at least one of the Board meetings with him, and has viewed the broadcasts of the Board meetings.  (SUF ¶¶ 15-16).  Every Board meeting Plaintiff Maldonado attended began with a prayer, sometimes delivered by the Board members themselves.  (First Maldonado Decl. ¶ 4).

### 2.  Standing

Defendants contend that Plaintiffs have failed to present evidence that Plaintiffs suffered an injury-in-fact.[3]  (Defs.' Opp'n at 3-7; Defs.' Supp. Briefing at 1-6).

Standing has three elements: (1) the plaintiff must have suffered an injury-in-fact—a concrete and particularized invasion of a legally protected interest that is actual or imminent, not conjectural or hypothetical; (2) the injury must be causally connected to the challenged action of the defendant; and (3) it must be likely and not merely speculative that the injury will be redressed by a favorable decision by the court.  <u>Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco</u>, 624 F.3d 1043, 1049 (9th Cir. 2010).  "The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context . . . because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to physical or pecuniary, nature."  <u>Id.</u> (internal quotations marks and citations omitted).

The Supreme Court has assumed standing sufficient to confer jurisdiction in all of the following Establishment Clause contexts: prayer at school football games, <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290 (2000), school prayer, <u>Engel v. Vitale</u>, 370 U.S. 421 (1962), a moment of silence in school, <u>Wallace v. Jaffree</u>, 472 U.S. 38, 49-50 (1985), daily recitations from the Bible at school, <u>Sch. Dist. of Abington Twp., Pa. v. Schempp</u>, 374 U.S. 203, 223 (1963), and a religious invocation at school graduations, <u>Lee v. Weisman</u>, 505 U.S. 577, 584 (1992) (finding a "live and justiciable controversy" where invocation was delivered at plaintiff's

---

[3] Defendants also contend that Plaintiffs' claims are not redressable, under the theory that the members of the Board possess legislative immunity for their "past or even prospective speech."  (Defs.' Opp'n at 7-9).  These arguments are discussed in the following sections on Legislative Immunity and Eleventh Amendment Immunity.

Case 5:14-cv-02336-JGB-DTB   Document 100   Filed 03/31/16   Page 14 of 36   Page ID
#:1481
Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 10 of 26   Page ID #:1233

middle school graduation and invocation was "likely, if not certain" to be delivered at her high
school graduation).  As the Ninth Circuit recognized,

> [n]o one was made to pray, or to pray in someone else's church, or to support
> someone else's church, or limited in how they prayed on their own, or made to
> worship, or prohibited from worshiping, in any of these cases. . . . [S]tanding (and
> therefore the concreteness element of standing) [was] sufficient in all of these
> cases, even though nothing was affected but the religious or irreligious sentiments
> of the plaintiffs.

Catholic League, 624 F.3d at 1050.  Nevertheless, the injury must be more directly connected to
the plaintiff than the observation that the government is violating the Constitution.  Id. at 1051-
52.  A "'psychological consequence'" of the government action will not be sufficient where it is
produced by mere "'observation of conduct with which one disagrees.'"  Id. (quoting Valley
Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464,
485 (1982)).  However, a plaintiff suffers a concrete harm where the "'psychological
consequence' is produced by government condemnation of one's own religion or endorsement of
another's in one's own community."  Id. at 1052.  Thus, Protestants in Pasadena could not sue
the City of San Francisco over its anti-Catholic resolution, but Catholics in San Francisco who
had come in contact with the resolution had suffered a sufficiently concrete harm in their own
community to have standing to file suit.  Id.  The psychological feeling of being excluded or
denigrated on a religious basis in one's own community is enough.  Id.

Plaintiff Maldonado is the father of Doe 4, a student in the District in the 11th grade.
(SUF ¶¶ 12-13.)  Plaintiff Maldonado attended several meetings of the Board, at least one
accompanied by Doe 4, and watched broadcasts of Board meetings on local television.  (SUF ¶¶
15-16.)  Every board meeting Plaintiff Maldonado attended began with a prayer, sometimes
delivered by Board members.  ("Third Maldonado Decl." ¶ 2, Doc. No. 78-1.)[4]  Plaintiff
Maldonado attests that the religious prayers at the Board meetings are offensive to his personal
beliefs.  (Third Maldonado Decl. ¶ 3.)  He further attests that he intends to go to future meetings
because he is the parent of a student of the District, and the meetings of the Board affect him as a
parent and his child.  (Third Maldonado Decl. ¶ 4.)  Plaintiff Maldonado does "not want to be

---

[4] Defendants object to the filing of Plaintiffs' second and third sets of declarations on the
grounds that it is improper to rely on evidence filed after the parties submitted their Statements
of Undisputed Fact and Genuine Disputes.  (Defs.' Supp. Briefing at 7-8.)  The Court requested
further briefing and declarations on the issue of standing at the November 16, 2015 hearing.  To
remedy any potential prejudice to Defendants, the Court provided Defendants an opportunity to
respond to Plaintiffs' supplemental declarations and briefing.  Defendants responded in a
supplemental briefing, and a set of objections to Plaintiffs' third set of declarations.  Neither
document objects to any fact in the declarations.  Indeed, in response to the third set of
declarations, Defendants reiterate that "there is still no dispute as to a material fact."  (Defs.'
Supp. Briefing at 3.)  The Court has reviewed Defendants' remaining arguments as to the form of
the declarations and the procedure for filing them and determined they are without merit.
Accordingly, the Court accepts Plaintiffs' third set of declarations as uncontroverted.

exposed to the prayers and the Board's promotion of any religious beliefs—regardless of what those beliefs are—in order to participate in the business of [his] child's school." (Third Maldonado Decl. ¶ 4.) Doe 4 also attests that the prayers are offensive to his personal beliefs, and that he does not want to encounter the prayers in order to participate in the meetings that affect his school and his fellow students.  (Doe 4 Decl. ¶¶ 1, 3-4, Doc. No. 78-1.)

Defendants argue that Plaintiffs have failed to establish an injury-in-fact because they have not attested that they no longer attend meetings because of the invocations, step out of the meetings during the prayers or mute the television if they watch the proceedings on television. (Defs.' Supp. Briefing at 3-5.)  However, to establish standing, a plaintiff need not be so excluded by a religious practice that he is compelled to remove himself altogether from the offending environment.  Catholic League, 624 F.3d at 1050.  Nor must he, as Defendants absurdly suggest, be driven to insomnia, anger or psychiatric care.  (Defs.' Supp. Briefing at 3.) Plaintiffs have submitted uncontroverted evidence that they attended Board meetings where religious prayers were delivered, often by Board members themselves.  They came into contact with government endorsement of another's religion in their own community, and suffered offense as a result.  They are likely to so suffer again as long as they are students, or parents of students, in the District who wish to remain engaged in their public school community.  Plaintiffs have plainly suffered an injury-in-fact in line with the school prayer cases cited above.

### 3.  Legislative Immunity

Defendants next contend that the Board members cannot be sued in their individual representative capacities because they qualify for legislative immunity pursuant to the Speech and Debate Clause and the "free speech rights of lawmakers." (Defs.' Opp'n at 8-10.)  This argument is meritless.  Legislators are entitled to absolute immunity from civil liability for their legislative activities and only for their legislative activities.  The test for determining whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it."  Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998).  It is "the nature of the function performed, not the identity of the actor who performed it," that may bring an action under the veil of legislative immunity.  Forrester v. White, 484 U.S. 219, 224, 227 (1988).

Courts examine whether the particular activities fall within the "legitimate legislative sphere."  Kilbourn v. Thompson, 103 U.S. 168, 204 (1881).  "In every case thus before this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process—the due functioning of the process."  United States v. Brewster, 408 U.S. 501, 515-16 (1972).

Defendants cannot contend that offering religious prayers, reading from the Bible and proselytizing constitute "an integral part of the deliberative and communicative processes" by which legislators "participate . . . in proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters" within the legislative sphere. Gravel v. United States, 408 U.S. 606, 625 (1972).  Because these actions are not legislative activities, immunity is unavailable to them.

### 4. Eleventh Amendment Immunity

Defendants next claim that the Board and its members cannot be sued because they enjoy immunity under the Eleventh Amendment. (Defs.' Opp'n at 22).

The applicability of the Eleventh Amendment to this case is nuanced, and depends on the Defendant and the form of relief sought. Plaintiffs seek injunctive and declaratory relief against Defendant Board of Education and Defendant Board members in their official capacities under the Federal and California constitutions. Plaintiffs also seek nominal damages for past violations of Plaintiffs' constitutional rights. Finally, Plaintiffs seek costs of this action including reasonable attorney's fees.

Under the Eleventh Amendment, unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, a State and its agencies are immune from suit in federal court regardless of the relief sought. Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985); Alabama v. Pugh, 438 U.S. 781, 781-82 (1978) (holding that a suit for injunctive relief against a state agency in a civil rights action is barred by the Eleventh Amendment). In California, county boards of education are arms of the State for the purposes of Eleventh Amendment immunity. Belanger v. Madera Unified Sch. Dist., 963 F.2d 248, 254 (9th Cir. 1992) (holding that California school districts are state agencies for purposes of Eleventh Amendment immunity); Eaglesmith v. Ward, 73 F.3d 857 (9th Cir. 1995) (extending Belanger's holding to county boards of education). Thus, absent the State's waiver of immunity or Congressional override, Plaintiffs are barred from seeking any form of relief against the Board in federal court. Accordingly, all claims against Defendant Board of Education are DISMISSED WITH PREJUDICE.

Nevertheless, it is well-established that, in an injunctive or declaratory action under § 1983, parties may overcome the State's immunity by naming state officials as defendants in their official representative capacity. Graham, 473 U.S. at 167 n.14 (1985).

> The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant. In such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do. An injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer.

Ex parte Young, 209 U.S. 123, 159 (1908). Here, Plaintiffs seek injunctive and declaratory relief against the Board members, sued in their individual representative capacities, to prevent them from continuing to violate Plaintiffs' constitutional rights under the First Amendment. "[O]fficial-capacity actions for prospective relief are not treated as actions against the State," Graham, 473 U.S. 159, 167 n.14 (1985), therefore the Eleventh Amendment does not bar Plaintiffs' § 1983 claims for injunctive and declaratory relief against the individual Board members. Additionally, the Eleventh Amendment does not bar Plaintiffs from seeking attorney's fees and costs for bringing a suit for prospective relief pursuant to 42 U.S.C. § 1988. See Missouri v. Jenkins by Agyei, 491 U.S. 274, 279 (1989) ("an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment").

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

However, the <u>Young</u> exception applies only to actions for prospective relief; it does not apply to actions against State officials for retrospective monetary relief. This is because "a judgment against a state official in his or her official capacity runs against the state and its treasury." <u>Guam Soc. of Obstetricians & Gynecologists v. Ada</u>, 962 F.2d 1366, 1371 (9th Cir. 1992), <u>as amended</u> (June 8, 1992) (citing <u>Graham</u>, 473 U.S. at 166).[5] Thus, Plaintiffs' claim for nominal damages for past violations of constitutional rights is barred by the Eleventh Amendment.

Further, Plaintiffs' state law claims are also barred by the Eleventh Amendment. The <u>Young</u> exception to Eleventh Amendment immunity is "inapplicable in a suit against state officials on the basis of state law." <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 106 (1984). As the Supreme Court reasoned in <u>Pennhurst</u>, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." <u>Id.</u> Accordingly, Plaintiffs' state law claims are DISMISSED WITH PREJUDICE.

In sum, the Eleventh Amendment bars all state and federal claims against the Board of Education, and all state claims against the individual Board members. The Eleventh Amendment also bars Plaintiffs' claim for nominal damages for past constitutional violations. However, the Eleventh Amendment does not bar Plaintiffs' § 1983 claims for injunctive and declaratory relief against the individual Board members sued in their official capacities, or Plaintiffs' claim for costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

### 5. The Merits

#### a. Establishment Clause Framework

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." Const. amend. I. Although "the myriad, subtle ways in which Establishment Clause values can be eroded" resist a "single verbal formulation," some aspects of Establishment Clause jurisprudence are clear. <u>Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter</u>, 492 U.S. 573, 590-91, (1989) <u>abrogated by</u> <u>Town of Greece, N.Y. v. Galloway</u>, 134 S. Ct. 1811 (2014) (quoting <u>Lynch v. Donnelly</u>, 465 U.S. at 694 (O'Connor, J., concurring)). The Establishment Clause prohibits the government from "promot[ing] or affiliat[ing] itself with any religious doctrine or organization, . . . discriminat[ing] among persons on the basis of their religious beliefs and practices, . . . delegat[ing] a governmental power to a religious institution, and . . . involv[ing] itself too deeply in such an institution's affairs." <u>Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter</u>, 492 U.S. 573, 590-91, (1989) <u>abrogated by</u> <u>Town of Greece, N.Y. v. Galloway</u>, 134 S. Ct. 1811 (2014). The Establishment Clause "applies equally to the states, including public school systems, through the Fourteenth Amendment." <u>Borden v. Sch. Dist. Of</u>

---

[5] Plaintiffs cite <u>Carey v. Piphus</u>, 435 U.S. 247 (1978) for the proposition that nominal damages are appropriate in actions for violations of constitutional rights. (Pls.' Supp. Briefing at 8-10.) However, neither <u>Carey</u> nor any of the cases cited by Plaintiffs confronted the Eleventh Amendment concerns presented here.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk <u>MG</u>

Twp. East Brunswick, 523 F.3d 153, 175 (3d Cir. 2008) (citing Wallace v. Jaffree, 472 U.S. 38, 49-50 (1985)). While the Supreme Court's nebulous jurisprudence in this area defies simple summation, the Court has often repeated the following distillation:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

Everson v. Board of Education of Ewing, 330 U.S. 1, 15-16 (1947); see also Allegheny, 492 U.S. at 591.

The central dispute in this case is which line of Establishment Clause cases governs school board prayer. Plaintiffs contend this case is governed by the long line of cases restricting prayer in public schools, and thus that the Lemon test should be applied as it was in those cases. Defendants contend that school board prayer qualifies for the legislative prayer exception first stated in Marsh v. Chambers, 463 U.S. 783 (1983), and recently applied in Town of Greece, N.Y. v. Galloway, 134 S. Ct. 1811 (2014).

The only two circuit courts to address this question have soundly, and after detailed analysis, concluded that school board prayer does not qualify for the legislative exception. Doe v. Indian River Sch. Dist., 653 F.3d 256 (3d Cir. 2011); Coles ex rel. Coles v. Cleveland Bd. of Educ., 171 F.3d 369 (6th Cir. 1999).   Defendants offer no contrary authority on the subject. Instead, they argue that the Court need not follow the Third and Sixth Circuits, and that those decisions no longer stand after the Supreme Court's recent ruling in Town of Greece.

In order to locate where this case stands in relation to the Third and Sixth Circuit school board prayer cases and Town of Greece, it is instructive to review the history of the school prayer cases and the legislative exception.

### i.  The School Prayer Cases

In the first school prayer case, Engel v. Vitale, 370 U.S. 421 (1962), the Supreme Court invalidated a New York State regulation requiring public school officials to recite a prayer at the start of each day.   The prayer read: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."  Id. at 422.  The Court invalidated the regulation, holding that "using [the] public school system to encourage recitation of the Regents' prayer" was "wholly inconsistent with the Establishment Clause."  Id. at 424.  The Court reasoned that the Establishment Clause "must at least mean that in this country it is no part of the business of government to compose official prayers for any group of

the American people to recite as part of a religious program carried on by government." Id. at 425. The Court rejected the arguments that the "nondenominational" nature of the prayer, and the fact that students were permitted to remain silent or leave the classroom during the prayer, freed it from the limitations of the Establishment Clause. Id. at 430. The Clause is violated by "enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." Id.

In Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 223 (1963), the Court invalidated two states' policies that required the reading of verses from the Bible at the beginning of each school day. The Court was unpersuaded by the states' argument that the program was an effort to promote moral values, and to "extend its benefits to all public school children without regard to their religious belief." Id. at 224. "[E]ven if its purpose is not strictly religious, it is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid . . . ." Id. The policies were unconstitutional because they "require[d] the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison," they were "prescribed as part of the curricular activities of students who are required by law to attend school," and they were "held in the school buildings under the supervision and with the participation of teachers employed in those schools." Id. at 223. As in Engel, the fact that children could be excused from participating or observing the prayer "furnishe[d] no defense to a claim of unconstitutionality under the Establishment Clause." Id. at 225 (citing Engel, 370 U.S. at 430).

Between Schempp and the next school prayer case, Wallace v. Jaffree, 474 U.S. 38 (1985), the Court announced a new standard for evaluating the constitutionality of state action under the Establishment Clause in Lemon v. Kurtzman, 403 U.S. 602 (1971). In determining whether government action violates the Establishment Clause, courts must evaluate: (1) whether the government practice has a secular purpose; (2) whether its principal or primary effect advances or inhibits religion; and (3) whether it "foster[s] an excessive government entanglement with religion." Id. at 612-13 (internal quotation marks and citations omitted). If the state action fails any prong, it violates the Establishment Clause. Id. Applying the "Lemon test" to Wallace, the Court held that a statute authorizing "a period of silence for meditation or voluntary prayer" failed the first prong—the legislative history revealed the purpose of the statute was to return prayer to schools. Wallace, 474 U.S. at 59-60.

The principal school prayer case for the purposes of the Third and Sixth Circuit decisions, and for the instant case, is Lee v. Weisman, 505 U.S. 577 (1992). In Lee, the Court declared that Providence, Rhode Island's policy of permitting principals to invite members of the clergy to give nonsectarian invocations and benedictions at middle school and high school graduations was unconstitutional. The Court focused on the following salient facts: First, government "officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools." Id. at 586. Because "[a] school official . . . decided that an invocation and benediction should be given; . . . from a constitutional perspective it is as if a state statute decreed that the prayers must occur." Id. at 587. Second, the principal, a state official, selected who would deliver the prayer. This choice, which was also attributable to the State, had the potential for "divisiveness." Id. Third, because the principal provided the clergyman with a pamphlet outlining guidelines for the prayers, and advised the clergyman that

his prayers should be nonsectarian, the government "directed and controlled the content of the prayers." Id. at 588. (citing Engel, 370 U.S. at 425 ("it is no part of the business of government to compose official prayers for any group of the American people to recite as part of a religious program carried on by government")). Fourth, "[e]ven for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma." Id. at 586.

The Court emphasized that schools present a special, constitutionally significant context—"there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." Id. at 592.  Prayers in the public schools "carry a particular risk of indirect coercion." Id.  "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." Id. at 592.

The "undeniable fact" was that the state's supervision and control of the graduation placed "public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction." Id. at 592.  This pressure, "though subtle and indirect, can be as real as any overt compulsion," particularly for "the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow." Id.; see also id. at 593-94 (citing research in psychology for the proposition that adolescents are especially susceptible to peer pressure).

Comparing the case directly to Marsh, the Court noted "obvious differences" between the public school context and a session of a state legislature.  First, "[t]he atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend." Id. at 597.  Second, a formal exercise in a school graduation has far greater "influence and force" than the prayer exercise condoned in Marsh. Id. Finally, because teachers and principals "retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students," the prayer becomes a "state-sanctioned religious exercise in which the student [is] left with no alternative but to submit." Id.  Thus, the comparison to the state legislature was inapposite.  The Court's decisions in Engel and Schempp "require [the Court] to distinguish the public school context." Id.

Finally, as in Engel and Schempp before it, the Court rejected the suggestion that the students had the choice to participate in the prayer because students voluntarily participated in the graduation and could still receive their diploma if they declined to attend. Id. at 594-96. "Law reaches past formalism." Id. at 595.  "[T]o say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme." Id.  Graduations are of significant cultural and personal significance.  They are a time for "family and those closest to the student to celebrate success and express mutual wishes of gratitude and respect." Id. "Attendance may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term 'voluntary.'" Id. at 595.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 17 of 26   Page ID #:1240

The Court cautioned that requiring a student to remove herself from graduation to avoid compromising her religious scruples runs afoul of the First Amendment.  The Constitution prohibits the state from forcing one of its citizens to "forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice."  Id. at 596.

The Court reiterated its concern in the public school context in Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290 (2000), striking down a school policy that authorized student-led invocations given prior to football games.  Under the policy, the senior class elected a student who was responsible for delivering a "brief invocation and/or message" at the start of each home varsity football game for the purposes of "solemniz[ing]" the event.  Id. at 296-97.  The Court found that, despite student involvement in selecting the prayer-giver and composing the invocation, the school was unconstitutionally "entangled" in religious activity.  Id. at 305-08.  The elections only took place because the school board created the policy; the invocations were delivered "as part of a regularly scheduled, school-sponsored function conducted on school property" and "broadcast over the school's public address system"; and they were delivered in a setting so replete with school symbols that a student would "unquestionably perceive the . . . pregame prayer as stamped with her school's seal of approval."  Id. at 307-08.

Once again, even regarding an event that is in some ways more "voluntary" than a high school graduation, the Court rejected the argument that students were free to absent themselves from football games if the pre-game prayer offended them.  Id. at 311.  The Court noted first that for some students, such as cheerleaders, band members and the football team, attendance was mandatory.  Id.  But even for other students, the Court recognized that attending extracurricular activities is "part of a complete educational experience."  Id. at 312.  As in all the school prayer cases before it, the Court found that the State may not "force [the] difficult choice upon these students . . . between attending [the] games and avoiding personally offensive religious rituals."  Id.  The Constitution "will not permit the District to exact religious conformity from a student as the price" of joining her classmates at a football game.  Id. (quoting Lee, 505 U.S. at 595-96).

### ii.  The Legislative Prayer Exception

Defendants contend that this is not a school prayer case, and that the facts of the case are more like the recitation of prayers at the opening of a state legislature.  In Marsh v. Chambers, 463 U.S. 783 (1983), the Supreme Court addressed the Nebraska legislature's practice of beginning each session with a prayer from a chaplain paid by the state.  Rather than apply the Lemon test, the Court rooted its analysis in the long history of prayer by legislative and deliberative bodies in the United States.  "[T]here can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society."  Id. at 792.  "From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom."  Id. at 786.  As early as 1774, the Continental Congress adopted the procedure of opening its sessions with a prayer by a paid chaplain.  Id. at 787.  The Court found it particularly telling that, on September 25, 1789, only three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights.  Id. at 788.

Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment,

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

Case 5:14-cv-02336-JGB-DTB   Document 100   Filed 03/31/16   Page 22 of 36   Page ID
#:1489
Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 18 of 26   Page ID #:1241

for the practice of opening sessions with prayer has continued without
interruption ever since that early session of Congress. It has also been followed
consistently in most of the states, including Nebraska . . . .

Id.  Given "the unambiguous and unbroken history of more than 200 years," the Court concluded
that "the First Amendment draftsmen . . . saw no real threat to the Establishment Clause arising
from a practice of prayer" similar to the one challenged in the Nebraska statehouse. Id. at 791.

### iii. The Legislative Exception Does Not Apply to Prayer at School Board Meetings

Reviewing the above cases, the only two circuit courts to address the issue have held that
the legislative exception does not apply to prayer at school board meetings, and that Lee and the
school prayer cases provide the more appropriate framework.[6] Doe v. Indian River Sch. Dist.,
653 F.3d 256 (3d Cir. 2011); Coles ex rel. Coles v. Cleveland Bd. of Educ., 171 F.3d 369 (6th
Cir. 1999).

In Indian River, the Third Circuit undertook a particularly thorough analysis that
incorporates many of the conclusions reached by the Sixth Circuit in Coles.  In 2004, the Indian
River School Board formalized a long-held practice of reciting prayers at their public meetings
by enacting a "Board Prayer" policy. Indian River, 653 F.3d at 261.  According to the policy,
"[i]n order to solemnify its proceedings" the board could choose to open each meeting with a
prayer or a moment of silence. Id.  The board members were themselves responsible for
choosing and offering the prayers on a rotating basis. Id.  The prayers would be "voluntary . . . .
No school employee, student . . . or member of the community" would be required to participate
in the prayer or moment of silence. Id.  And the prayers could be sectarian or non-sectarian, "all
in accord with the freedom of conscience, speech and religion of the individual Board member . .
. ." Id. at 262.

Reading the jurisprudence outlined above, the Third Circuit divined that "the need to
protect students from government coercion in the form of endorsed or sponsored religion" is
central to the school prayer cases. Id. at 275.  The Supreme Court identified time and again that
the risk of coercion is "heightened" in the public school context where the State exerts great

---

[6] The Ninth Circuit has not addressed whether school board prayer should be treated as
school prayer, or as legislative prayer. Although the Ninth Circuit confronted the issue in Bacus
v. Palo Verde Unified Sch. Dist. Bd. of Educ., 52 F. App'x 355, 356 (9th Cir. 2002), an
unpublished opinion, the Ninth Circuit concluded it did not need to determine whether prayers at
school board meetings are more like prayers in schools or in state legislatures, because the
sectarian nature of the invocations were unconstitutional in either context.  Although that holding
would likely not stand today in light of Town of Greece, N.Y. v. Galloway, 134 S. Ct. 1811
(2014) (finding sectarian prayers opening town board meetings constitutional under Marsh's
legislative exception), it is of no import to the present case.  The Ninth Circuit explicitly declined
to address the question the Court answers today.

authority over children, who are impressionable and susceptible to peer pressure.  Id. (citing Lee, 505 U.S. at 587); see also Edwards v. Aguillard, 482 U.S. 578, 584 (1987).

Although attendance at board meetings was not mandatory for most students, the Indian River court found that the school board prayed in an atmosphere that "contain[ed] many of the same indicia of coercion and involuntariness" that troubled the Supreme Court in the school prayer cases.  Id.  Attendance was not technically mandatory at school graduation in Lee or football games in Santa Fe, but the Supreme Court maintained that "law reaches past formalism." Like graduations, Indian River School Board's long-standing practice of recognizing student achievement at the meetings provided a venue for "family and those closest to the student to celebrate success." Id. at 276 (quoting Santa Fe, at 312).  While a school board meeting may not be "one of life's most significant occasions," the Indian River School Board "deliberately made its meetings meaningful to students in the district" through student involvement and the presentation of awards.  A student who absents herself from the meeting to avoid the prayer will "forfeit . . . intangible benefits" that "have motivated the student" throughout her education.  Id. (quoting Lee, 505 U.S. at 595).  The Third Circuit recognized that this would have additional implications where entire teams are honored, as a student "may feel especially coerced" by peer pressure "to attend a meeting where the Board recites a prayer." Id. at 277.

For some students, attendance was closer to compulsory.  Id.  Student government representatives "routinely attend[ed] the meetings" and "directly represent[ed] student interests" at the meetings.  Id.  Their presentations to the board were a specific part of the agenda.  Id.  The Third Circuit acknowledged these students' commitment to their position:

> To say that the attendance of student government representatives is not part of their extracurricular obligations is to undermine the contributions these students make to their school and their communities. In this regard, they are . . . like the "cheerleaders, members of the band, and, of course, the team members themselves, for whom seasonal commitments mandate their attendance" at football games.

Indian River, 653 at 278 (quoting Santa Fe, 530 U.S. at 290).

As in all the school prayer cases, the Third Circuit refused to accept the board's suggestion that objecting audience members, including students, could absent themselves from the meetings or leave the room during the prayer.  Id. at 278.  "Simply put, giving a student the option to leave a prayer 'is not a cure for a constitutional violation.'" Id. (quoting Lee, 505 U.S. at 596).  "'It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice.'" Id. (quoting Lee, 505 U.S. at 596).

The Third Circuit also found that the school board's inseparable relationship to the school increased the possibility "that students will feel coerced into participating in the prayer practice." Id. at 278.  Board meetings took place on school property, the board retained control over the meeting, and "it is in this context that the Board itself composes and recites the prayer." Id. "Under these circumstances," the court found it "difficult to imagine" that a student appearing before the board would not feel pressure to participate in the prayer. Id.

Addressing the applicability of the legislative exception, the Third Circuit concluded that, regardless of a school board's superficial similarities to "deliberative or legislative" bodies,[7] "Marsh is ill-suited to this context because the entire purpose and structure" of the school board "revolves around public school education." Id. All of the board's responsibilities pertain to educating students and administering the school system. Id. These responsibilities "further highlight the compulsory nature of student attendance," as "[a] student wishing to comment on school policies or otherwise participate in the decision-making that affects his or her education *must* attend these meetings." Id. (emphasis in original).

Moreover, several features of the school board, identified by the Sixth Circuit in Coles, distinguish it from other legislative bodies:

> Although the school board, like many other legislative bodies, is composed of publicly elected officials drawn from the local community, that is where the similarity ends. . . . Simply stated, the fact that the function of the school board is uniquely directed toward school-related matters gives it a different type of "constituency" than those of other legislative bodies-namely, students. Unlike ordinary constituencies, students cannot vote. They are thus unable to express their discomfort with state-sponsored religious practices through the democratic process. Lacking a voice in the electoral process, students have a heightened interest in expressing their views about the school system through their participation in school board meetings

> [U]nlike officials of other legislative bodies, school board members are directly communicating, at least in part, to students. They are setting policies and standards for the education of children within the public school system, a system designed to foster democratic values in the nation's youth, not to exacerbate and amplify differences between them . . . .

> Meetings of the board serve as a forum for students to petition school officials on issues affecting their education. Simply put, students do not sit idly by as the board discusses various school-related issues. School board meetings are therefore not the equivalent of galleries in a legislature where spectators are incidental to the work of the public body; students are directly involved in the discussion and debate at school board meetings.

Id. at 279-80 (quoting Coles, 171 F.3d at 381-82).

Ultimately, having carefully considered "the role of students at school boards, the purpose of the school board, and the principles underlying the Supreme Court's school prayer case law," the Third Circuit, like the Sixth Circuit before it, found that school board prayer

---

[7] Notably, the Supreme Court did not define a "legislative" or "deliberative" body anywhere in Marsh or Town of Greece. See also Indian River, 653 F.3d at 274.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk MG

belongs under <u>Lee</u>, not <u>Marsh</u>. <u>Id.</u> at 281. The courts are "tasked with 'protect[ing] freedom of conscience from subtle coercive pressure in the elementary and public schools.'" <u>Id.</u> (quoting <u>Lee</u>, 505 U.S. at 592). "<u>Marsh</u> does not adequately capture these concerns." <u>Id.</u> at 275.

The salient facts in the present case—and the indicia of coercion and involuntariness— are identical to <u>Indian River</u>. Meetings of the Chino Valley School Board take place on school district property, sometimes inside the schools. (SUF ¶¶ 22, 23, 64, 69). Students are in regular attendance. (SUF ¶¶ 19, 26, 28, 106, 108). One student representative is a member of the Board and is responsible for representing the student body's interests. (SUF ¶¶ 20, 28). Other students attend Board meetings to receive awards for their accomplishments, publicly celebrate their extracurricular successes and perform alongside their classmates. (SUF ¶¶ 26-27; Pls.' Ex. 24, Minutes 03/06/2014). Student presentations to the Board are a regular feature of the agenda and immediately follow the opening prayer. (<u>Id.</u>)

These students are not mere observers on a field trip, watching a legislative assembly from a quiet balcony. They are participants—"constituents" of the Board drawn to the meetings to seek relief (in the case of disciplinary proceedings), (SUF ¶ 108), acknowledgment of their curricular and extracurricular successes, (SUF ¶¶ 26-27), or change to the policies that govern their daily lives, (SUF ¶¶ 20, 28). They are also children, students of the District that rises before them and asks them to pray.

As the Third and Sixth Circuits recognized, school board meetings "bear several markings of involuntariness and the implied coercion" that the Supreme Court acknowledged in <u>Lee</u> and <u>Santa Fe</u>. <u>Indian River</u>, 653 F.3d at 276. But the risk that a student will feel coerced by the Board's policy and practice of religious prayer is even higher here than at football games or graduations. The School Board possesses an inherently authoritarian position with respect to the students. The Board metes out discipline and awards at these meetings, and sets school policies that directly and immediately affect the students' lives. (SUF ¶¶ 20, 26-28, 108). The Board faces the audience, which inevitably includes students, either from a table inside a school or from a raised dais in the Board room with the seal of the Chino Valley Unified School District emblazoned on the wall behind them. (<u>See</u> Pls.' Ex. 1-15). In this formal, manifestly school-sponsored setting, the power imbalance between the State and the students is even more pronounced than at football games or graduations. The student who has come before the Board is unlikely to feel free to dissent from or walk out on the body that governs, disciplines, and honors her.

The differences between <u>Indian River</u> and the present case are not sufficiently significant to remove this case from the public school and place it in a state legislature. The primary difference is that in <u>Indian River</u>, the policy provided that board members were responsible for selecting and delivering the prayer. Here, the Resolution—at least on its face—provides that the Board shall randomly select clergyman from the community who will be responsible for giving the prayer. (SUF ¶ 4; Pls.' Ex. 52). However, the Resolution also provides that, if for whatever reason clergymen are not selected, a Board member may compose and deliver the prayer, (<u>id.</u>), which effectively renders this distinction without a difference. In practice, Board members have delivered the opening invocation on multiple occasions, and frequently read from the Bible and proselytized religious messages at other points in the meeting. (SUF ¶¶ 31, 34-37, 40, 43, 48, 51, 55, 57, 60-61, 67, 70, 76, 78, 81, 85, 89).

Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 22 of 26   Page ID #:1245

While this difference is arguably relevant to determining the degree of government entanglement with religion under the Lemon test, it is not relevant, and certainly not dispositive, to determining whether prayer at school board meetings is more like school prayer or legislative prayer. The crucial factors are still present. School officials, the Board members, passed the Resolution creating this policy. (SUF ¶ 4); see Santa Fe, 530 U.S. at 307 (finding entanglement in part because the school had crafted the policy permitting student prayer). School Board meetings take place on school property, see id., and deal exclusively with issues pertaining to the school district and the education of its students, see Coles, 171 F.3d at 381-82. And most importantly, students attend the meetings.

Defendants contend that the Supreme Court's recent ruling in Town of Greece, 134 S.Ct. 1811 (2014), alters this analysis, but if anything, Town of Greece further supports the notion that the legislative exception is limited to houses of governance in the world of mature adults. In Town of Greece, the Supreme Court held that the practice of opening town board meetings with a sectarian prayer was constitutional under Marsh. Town of Greece was not a sea change across all lines of First Amendment jurisprudence; rather, it extended Marsh from the statehouse to town halls, and held that *legislative* prayers delivered therein need not be non-sectarian. Id. at 1827. Town of Greece left the school prayer cases, upon which Indian River, Coles, and this Court rely, undisturbed.

Moreover, the Supreme Court reiterated that the Establishment Clause "inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." Town of Greece, 134 S. Ct. at 1825. Considering the factual circumstances of the town board meeting, the Court repeatedly emphasized that the audience impacted by this decision are adults:

> Our tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith. . . .

> Offense . . . does not equate to coercion. Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum.

Id. at 1823, 1826. If the underlying comparison to children in the school prayer cases was not already visible, Justice Kennedy, the author of Lee v. Weisman, raised the point to the surface:

> Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults, who "presumably" are "not readily susceptible to religious indoctrination or peer pressure."

Id. at 1827 (quoting Marsh, 463 U.S. at 792). Of course, the school prayer cases stand firmly for the proposition that such a choice represents an unconstitutional imposition as to students who

Case 5:14-cv-02336-JGB-DTB   Document 100   Filed 03/31/16   Page 27 of 36   Page ID
#:1494
Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 23 of 26   Page ID #:1246

*are* readily susceptible to religious indoctrination and peer pressure.  The State may not place "primary and secondary school children" in the "dilemma of participating" in the prayer, "with all that implies, or protesting." Lee, 505 U.S. at 593 (declining to address "whether that choice is acceptable if the affected citizens are mature adults").

In sum, nothing in Town of Greece indicates an intent to disturb the long line of school prayer cases outlined above, or the "heightened concern" they express for children forced to confront prayer in their public school, and there is every indication it preserves it. Lee, 505 U.S. at 592.  For the reasons stated above, and in the absence of any contrary authority,[8] the Court agrees with the reasoning in Indian River and Coles and finds it governs the instant case. Because of the distinct risk of coercing students to participate in, or at least acquiesce to, religious exercises in the public school context, the Court finds the legislative exception does not apply to the policy and practice of prayer in Chino Valley School Board meetings.

### b.  The Lemon Test

Because this case is controlled by Lee and the school prayer cases, the Court must next decide whether the School Board's prayer policy violates the Establishment Clause.  In Lemon v. Kurtzman, 403 U.S 602 (1971), the Supreme Court articulated a three-part test to determine whether a challenged government action offends the Establishment Clause.  Under Lemon, the court must determine "(1) whether the government practice had a secular purpose; (2) whether its principal or primary effect advanced or inhibited religion; and (3) whether it created an excessive entanglement of the government with religion." Id. at 612-13.  The Supreme Court's more recent cases collapse the last two prongs to ask "whether the challenged governmental practice has the effect of endorsing religion." Trunk v. City of San Diego, 629 F.3d 1099, 1109 (9th Cir. 2011).  If the challenged practice fails any part of the Lemon test, it violates the Establishment Clause.  See Stone v. Graham, 449 U.S. 39, 40-41 (1980).

### i.  Secular Purpose

The first prong centers on the intentions of the government, and asks whether "the government intended to convey a message of endorsement or disapproval of religion" when it implemented the challenged policy.  Edwards v. Aguillard, 482 U.S. 578, 585 (1987).  The government's purpose need not be exclusively secular, but it will violate the Constitution if it is "entirely motivated by a purpose to advance religion." Wallace v. Jaffree, 472 U.S. 38, 56 (1985).  The government's stated purpose is "entitled to some deference," Santa Fe, 530 U.S. at 380, however the stated secular purpose must be sincere and not merely a sham, see Edwards, 482 U.S. at 586.

---

[8] Defendants contend that Rubin v. City of Lancaster, 710 F.3d 1087 (9th Cir. 2013), where the Ninth Circuit applied Marsh to prayers in city council meetings, is applicable to this case.  Rubin is inapposite.  Like Town of Greece, Rubin did not concern students in the public school context.  Moreover, the parties in Rubin assumed that it was legislative prayer case properly analyzed under Marsh, therefore Rubin did not address the question before the Court.  Rubin, 710 F.3d at 1091.

Relying on their legislative exception argument, Defendants do not address the <u>Lemon</u> test in their Opposition. Nevertheless, the text of the Resolution states that its purpose is to "solemnify" the proceedings of the Board. (SUF ¶ 4; Pls.' Ex. 52). This is entitled to some deference. <u>Santa Fe</u>, 530 U.S. at 380. However, the statements of the members of the Board who enacted this Resolution "cast serious doubt on the sincerity of the school board's articulated secular purpose." <u>Coles</u>, 171 F.3d at 384. At one meeting that began with a prayer, Board member James Na, "urged everyone who does not know Jesus Christ to go and find him." (SUF ¶ 49). At another, Board member Andrew Cruz told the audience, "[y]ou needed the right Board to follow that path. And I find that extraordinary. I think there are very few districts of that powerfulness of having a board such as ourselves having a goal. And that one goal is under God, Jesus Christ." (SUF ¶ 51). Mr. Cruz then read from the Bible, Psalm 143:8. (SUF ¶ 51).

These overtly religious, proselytizing statements, among others of similar nature, though not part of the opening prayer authorized by the Resolution, raise serious questions as to the true motivation behind the Resolution. <u>Cf.</u> <u>Sch. Dist. of Abington Twp., Pa. v. Schempp</u>, 374 U.S. 203, 224 (1963) ("[E]ven if its purpose is not strictly religious, it is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid . . . ."). Moreover, there are many non-sectarian ways to solemnize a school event and "'the state cannot employ a religious means to serve otherwise legitimate secular interests.'" <u>Coles</u>, 171 F.3d at 384 (quoting <u>Jager v. Douglas County Sch. Dist.</u>, 862 F.2d 824, 830 (11th Cir. 1989)). "The board could have used the inspirational words of Abraham Lincoln or . . . the speeches of Dr. Martin Luther King, Jr. to achieve the same ends. Instead, the board relied upon the intrinsically religious practice of prayer to achieve its stated secular end." <u>Id.</u> Because the Court questions the sincerity of the asserted secular purpose, and because solemnization of the meetings could have been achieved without resort to religious prayer, the Resolution fails to satisfy the purpose prong of the <u>Lemon</u> test. <u>See</u> <u>id.</u>

### ii. Endorsement

Under the second prong of the <u>Lemon</u> test, the question is whether the government action could be reasonably construed "as sending primarily a message of either endorsement or disapproval of religion." <u>Trunk</u>, 629 F.3d at 1109. The Ninth Circuit is particularly concerned with those acts that "send the stigmatic message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . ." <u>Id.</u> (quoting <u>Santa Fe</u>, 530 U.S. at 309-10). The inquiry is conducted "from the perspective of an informed and reasonable observer who is familiar with the history of the government practice at issue." <u>Id.</u> (internal quotation marks and citations omitted).

The largely religious content of the opening prayers, combined with undeniably religious Bible readings and references to Jesus Christ by Board members throughout the meetings, would suggest to a reasonable person that the primary effect of the Board's Resolution and statements is to promote Christianity. <u>See</u> <u>Indian River</u>, 653 F.3d at 285 (finding it "difficult to accept" that a reasonable person would not find the primary effect of the policy was to advance religion where prayers were "nearly exclusively Christian" including "explicit references to God or Jesus Christ"). Chino Valley Board members "decided to include the prayer in [their] public meetings," and at times, they compose and deliver the opening prayer to the audience themselves. <u>Coles</u>, 171 F.3d at 385; <u>Indian River</u>, 653 F.3d at 289. This alone would suggest to

Case 5:14-cv-02336-JGB-DTB   Document 87   Filed 02/18/16   Page 25 of 26   Page ID #:1248

the reasonable person that the state has placed its imprimatur upon the religious prayers offered at the meetings. Id. But Board members repeatedly reading from the Bible and "urg[ing]" an audience of students, parents and teachers who "do not know Jesus Christ to go and find him" cannot be reasonably interpreted any other way. See Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens, 496 U.S. 226, 264 (1990) (Marshall, J., concurring) ("If public schools are perceived as conferring the *imprimatur* of the State on religious doctrine or practice," they run "afoul of the Establishment Clause.").

Regardless of the stated purpose of the Resolution, it is clear that the Board uses it to bring sectarian prayer and proselytization into public schools through the backdoor. Because the Board's policy and practice of prayer during its meetings ultimately conveys the message of government endorsement of Christianity in the public school system, it fails the Lemon test and therefore violates the Establishment Clause of the First Amendment.

Furthermore, because the Court finds that the Resolution permitting religious prayer in Board meetings is unconstitutional, it follows that the Board's practice of praying, reading from the Bible and proselytizing religious messages after the opening prayer also violates the Establishment Clause. The Board cannot achieve outside of the Resolution what it cannot achieve through it.

### 6. Plaintiffs' Claims Against Defendants Orozco, Hernandez-Blair, and Dickie in their Official Capacities

Defendants contend that the claims against Defendant Board members Orozco, Hernandez-Blair and Dickie should be dismissed because Plaintiffs do not assert that they proselytized or did anything other than sign the Resolution.

The Board members are each named as Defendants in their official capacities. It is of no moment that Defendants Hernandez-Blair and Orozco did not personally proselytize from the dais. They remain members of the Board, they are responsible for the administration of the Board meetings, and they are therefore properly enjoined in their official capacities from implementing the Resolution the Court has ruled unconstitutional.

The claims against Defendant Dickie, however, must be dismissed. Although Dickie personally delivered religious prayers in Board meetings, Dickie is no longer a member of the Board, (SUF ¶ 3), therefore he cannot be sued for prospective relief in an official capacity he no longer retains. Accordingly, the claims for prospective relief against Defendant Dickie are DISMISSED WITH PREJUDICE.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Plaintiffs' Motion for Summary Judgment. Accordingly, the Court DENIES Defendants' Motion for Summary Judgment, which relied on substantially similar claims to those raised in Opposition to Plaintiffs' Motion.

As discussed above, the Court dismisses all state and federal claims against the Defendant Board, and all state claims against the Defendant Board members in their individual

official capacities, as barred by the Eleventh Amendment. The Court also dismisses all claims against Defendant Dickie, who is no longer a member of the Board.

The Court finds Plaintiffs are entitled to a declaratory judgment against the remaining Defendants that the Resolution permitting religious prayer in Board meetings, and the policy and custom of reciting prayers, Bible readings, and proselytizing at Board meetings, constitute unconstitutional government endorsements of religion in violation of Plaintiffs' First Amendment rights. The Court further finds that Plaintiffs are entitled to injunctive relief against the remaining Defendant Board members in their individual representative capacities. Defendant Board members are enjoined from conducting, permitting or otherwise endorsing school-sponsored prayer in Board meetings. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to costs, including reasonable attorney's fees, incurred in bringing this action to vindicate violations of Plaintiffs' constitutional rights.

Judgment shall be entered for Plaintiffs in accordance with this Order.

**IT IS SO ORDERED.**

# JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., ET AL. | Case No. EDCV 14-2336-JGB (DTBx) |
| Plaintiffs, | **JUDGMENT** |
| v. | |
| CHINO VALLEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, ET AL. | |
| Defendants. | |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to the Order filed herewith, Plaintiffs' Motion for Summary Judgment is GRANTED as to Plaintiffs' claims under Section 42 U.S.C. § 1983 against Defendants James Na, Sylvia Orozco, Andrew Cruz and Irene Hernandez-Blair, members of the Chino Valley Unified School District Board of Education in their official representative capacities, for violations of Plaintiffs' First Amendment rights.

The Court orders that judgment shall be entered as follows:

1

Case 5:14-cv-02336-JGB-DTB   Document 100   Filed 03/31/16   Page 32 of 36   Page ID
#:1499
Case 5:14-cv-02336-JGB-DTB   Document 88   Filed 02/18/16   Page 2 of 2   Page ID #:1251

1.   The Court DECLARES that the Resolution
     permitting religious prayer in Board meetings,
     and the policy and custom of reciting prayers,
     Bible readings, and proselytizing at Board
     meetings, constitute unconstitutional
     government endorsements of religion in
     violation of Plaintiffs' First Amendment
     rights.

2.   Defendants James Na, Sylvia Orozco, Andrew Cruz
     and Irene Hernandez-Blair, members of the Chino
     Valley Unified School District Board of
     Education in their official representative
     capacities, are hereby ENJOINED from
     conducting, permitting or otherwise endorsing
     school-sponsored prayer in Board meetings.

3.   Pursuant to 42 U.S.C. § 1988, Plaintiffs are
     entitled to costs, including reasonable
     attorney's fees, incurred in bringing this
     action to vindicate violations of Plaintiffs'
     constitutional rights.


IT IS SO ORDERED.


Dated: February 18, 2016

                              HE HONORABLE JESUS G. BERNAL
                              United States District Judge

2

1  TYLER & BURSCH, LLP
2  Robert H. Tyler, CA Bar No. 179572
   rtyler@tylerbursch.com
3  Jennifer L. Bursch, CA Bar No. 245512
4  jbursch@tylerbursch.com
5  24910 Las Brisas Road, Suite 110
   Murrieta, California  92562
6  Tel:   (951) 600-2733
7  Fax:   (951) 600-4996

8  Attorneys for Defendants, **CHINO**
9  **VALLEY UNIFIED SCHOOL**
   **DISTRICT, et al.**
10

11              **UNITED STATES DISTRICT COURT**

12        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

13

14

15

16  FREEDOM FROM RELIGION          Case No.:  EDCV 14-2336-JGB (DTBx)
    FOUNDATION, INC.; DOE 1, a minor by
17  and through his/her guardian; DOE 2, and  **DEFENDANTS'**
    DOE 2 individually; DOE 3 and DOE 4,      **REPRESENTATION STATEMENT**
18                                            **PURSUANT TO LOCAL CIRCUIT**
19  Plaintiffs,                               **RULE 3-2**

20                                            Judge:   Jesus G. Bernal
    vs.
21

22  CHINO VALLEY UNIFIED SCHOOL
    DISTRICT BOARD OF EDUCATION; and
23  CHINO VALLEY UNIFIED SCHOOL
24  BOARD OF EDUCATION BOARD
    MEMBERS JAMES NA, SYLVIA
25  OROZCO, CHARLES DICKIE, ANDREW
26  CRUZ, IRENE HERNANDEZ-BLAIR, in
    their official representative capacities,
27

28  Defendants.

---

1

**DEFENDANTS' REPRESENTATION STATEMENT**                    EDCV 14-2336-JGB (DTBx)
**PURSUANT TO LOCAL CIRCUIT RULE 3-2**

The undersigned represents Defendants-Appellees, Chino Valley Unified School District Board Of Education; Chino Valley Unified School Board Of Education Board Members James Na, Sylvia Orozco, Charles Dickie, Andrew Cruz, and Irene Hernandez-Blair, in their official representative capacities in this matter and no other party.  The following are parties to this action, along with the names, addresses, and telephone numbers of their respective counsel:

**A.    Plaintiffs-Respondents**

Freedom From Religion Foundation, Inc.; Doe 1, a minor by and through his/her guardian; Doe 2, and Doe 2 individually; Doe 3 and Doe 4

**B.    Counsel for Plaintiffs-Respondents**

David J P Kaloyanides

Andrew L. Seidel

Rebecca Markert

David J P Kaloyanides Law Offices

15338 Central Avenue

Chino, California  91710

Telephone:  213-623-8120; Facsimile:  213-402-6292

**Defendants-Appellants**

Chino Valley Unified School District Board Of Education; Chino Valley Unified School Board Of Education Board Members James Na, Sylvia Orozco, Charles Dickie, Andrew Cruz, and Irene Hernandez-Blair, in their official representative capacities

///
///
///
///
///
///

2

1
C.   **Counsel for Defendants-Appellants**

2
Robert H. Tyler, Esq.

3
Jennifer L. Bursch, Esq.

4
Tyler & Bursch, LLP

5
24910 Las Brisas Road, Suite 109

6
Murrieta, California  92562

7
Telephone:  (951) 600-2733; Facsimile:  (951) 600-4996

8

9
Respectfully submitted,

10
TYLER & BURSCH, LLP

11

12
Dated:  March 30, 2016

/s/ Robert H. Tyler

13
Robert H. Tyler

Attorneys for Defendants **CHINO**

14
**VALLEY UNIFIED SCHOOL**

**DISTRICT BOARD OF EDUCATION,**

15
**and CHINO VALLEY UNIFIED**

16
**SCHOOL DISTRICT BOARD OF**

**EDUCATION BOARD MEMBERS**

17
**JAMES NA, SYLVIA OROZCO,**

18
**CHARLES DICKIE, ANDREW CRUZ,**

19
**and IRENE HERNANDEZ-BLAIR**

20

21

22

23

24

25

26

27

28

3

# CERTIFICATE OF SERVICE

I am employed in the county of Riverside, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 24910 Las Brisas Road, Suite 110, Murrieta, California 92562.

On March, 31, 2016, I caused to be served the foregoing documents described below on the following interested parties in this action:

## CIVIL APPEALS DOCKETING STATEMENT

☒   Via **ELECTRONIC CASE FILING**, by which listed counsel will automatically receive e-mail notices with links to true and correct copies of said documents:

- **David J P Kaloyanides**
  djpkaplc@me.com
- **Andrew L Seidel**
  aseidel@ffrf.org
- **Rebecca Markert**
  rmarkert@ffrf.org

Executed on March 31, 2016, at Murrieta, California.

☒   (Federal)   I declare that I am a member of the Bar of this Court at whose direction the service was made.

s/ Robert H. Tyler
_____
Email: rtyler@tylerbursch.com
