UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

HONORABLE JESUS G. BERNAL, U.S. DISTRICT JUDGE

LAWRENCE WEINSTEIN, on behalf FREEDOM FROM RELIGION FOUNDATION, INC., et al.,

Plaintiff,

vs.

CHINO VALLEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, et al.,

Defendants.

CASE NO. 14-2336-JGB

REPORTER'S TRANSCRIPT OF ORAL PROCEEDINGS
RIVERSIDE, CALIFORNIA
MONDAY, NOVEMBER 16, 2015
9:00 A.M.

ADELE FRAZIER, CSR 9690, CRR, RMR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
adelefraziercsr@gmail.com

**APPEARANCES OF COUNSEL:**

**For the Plaintiffs:**

DAVID J. KALOYANIDES
Attorney at Law
15338 Central Avenue
Chino, California 91710

**For the Defendants:**

LAW OFFICES OF MICHAEL J. PEFFER
BY: MICHAEL J. PEFFER
3843 South Bristol, Suite 182
Santa Ana, California 92704

RIVERSIDE, CALIFORNIA; MONDAY, NOVEMBER 16, 2015

9:00 A.M.

THE COURTROOM DEPUTY: Calling item number 1, case number EDCV 14-2336-JGB, Freedom from Religion Foundation, et al., vs. Chino Valley Unified School District Board of Education, et al. Counsel, please state your appearances.

MR. KALOYANIDES: David Kaloyanides for the plaintiff.

THE COURT: Good morning.

MR. PEFFER: Michael Peffer for the defendants.

THE COURT: Good morning.

The matter is on for cross motions for summary judgment based upon the School Board's policy of invocations before School Board meetings. There's been substantial briefing on the issue and most of the facts seem to be undisputed.

Let's go through -- in order through the standing issue. In the supplemental declarations supplied by plaintiff there is additional information regarding the alleged injury, but there's still not, in my mind maybe, perhaps, sufficient information regarding prospective intent to attend the meetings.

So how do you address that, Mr. Kaloyanides? Do you think the information submitted is sufficient or not?

MR. KALOYANIDES: It is, your Honor, because the --

there's still many minor students and -- attending in the district, and the parents have indicated in those declarations that they want to, and intend to, attend additional board meetings, and that shows the continuing prospective injury.

THE COURT: Right. About how about the sufficiency of the specific meetings which have been attended by the named plaintiffs? Is it sufficient in your mind to say if either attended meetings or viewed meetings without delineating specific meetings attended and the prayers that were delivered at those meetings?

MR. KALOYANIDES: Well, I think that that's not actually what the evidence shows. In fact, the defendants have admitted that one of our named plaintiffs on a specific meeting was there. And I don't think that standing requires that we identify every specific meeting by date as long as we can point to the fact that we have attended meetings and the children have attended meetings. But even if it does require a specific date, Mr. Maldonado identified specifically by date, and defendants admitted that in their answer to the complaint. So I don't think that's even an issue.

THE COURT: Very well. Let's turn, then, to the issue of immunity. There's two arguments by the defendants regarding immunity. One is an argument that the defendants in this case are shielded by legislative immunity. I think that argument fails. Legislative immunity is for acts specifically

that are legislative. And it takes the point of view of the act, not the actor, as to the conduct that is being challenged. I think it's pretty undisputed that the specific acts which are challenged in this case are not legislative acts in and of themselves, So I think legislative immunity is not present.

As to immunity under the Eleventh Amendment, Mr. Kaloyanides, there is some case law that points to the fact that under California law, perhaps different than in other states, school boards -- well, school districts are treated as arms of the state and not as local entities, so they are subject to Eleventh Amendment immunity. How do you respond?

MR. KALOYANIDES: In the *Young* case it's clear that when you're suing officials in their representative capacity, that's the --

THE COURT: As to the amendment itself.

MR. KALOYANIDES: I think that is the issue as to whether the district itself, as the governing body, whether or not the district would have -- I guess the real question is at the end of the day part of the problem with the Eleventh Amendment analysis is that we have the entity, when it's funded by the state, being absorbed into the state official entity, therefore, subject to the Eleventh Amendment.

But when you're going towards the actual officers or elected officials in their representative capacity -- that's carved out -- the analysis seems to -- and here's where the

gray here comes in. The analysis seems to focus on who would have to pay for the damages, essentially. If it's the state, then it becomes an arm of the state, and yet it still allows for suing the elected officials, even though the state would have to cover the elected officials as well. So I think that that's still a gray area.

THE COURT: So speaking of damage, you mention a relief for nominal damages. Against whom and on what basis do you request that?

MR. KALOYANIDES: The nominal damages would be for the past harm, particularly to the minor students, but to all the plaintiffs. But, really, the case is about the injunctive relief, and the Eleventh Amendment doesn't apply in that setting when we're talking about prospective.

THE COURT: As to individual representative capacity?

MR. KALOYANIDES: As to the individual elected officials.

THE COURT: So how would it work, then, if I were to enjoin the current members of the School Board and if new members were then elected, how would that injunction apply to them?

MR. KALOYANIDES: I think that the injunction has to be to all elected officials, because they represent the board. They are the board. And I don't think that the injunctive relief would just go to the individuals currently sitting

because then we're going to be back here if new elected officials do the same thing and that, kind of, undermines the purpose of the injunctive relief.

I don't think the *Young* exception restricts the Court from enjoining the representatives. They don't have to be necessarily the same representatives. It's the office that is the problem, and so, therefore, I think the Court can, in fact, impose an injunction against the office as itself even if the Court finds that the district as an entity --

THE COURT: So is it your position, then, the individuals which had not been elected, and would be elected in the future, would be enjoined by enjoining the current individuals in their representative capacity?

MR. KALOYANIDES: I could see the problem with that, and I haven't thought that exactly through. Certainly, obviously, the injunction would apply to the current. That would be a given. But I'd have to give more thought to whether or not -- here's my conundrum that I'm just realizing: If the Court were to enjoin the office, is that not in effect just enjoining the district as opposed to the individual?

THE COURT: Right.

MR. KALOYANIDES: And I see that as a problem. Again, I still think there's a gray area there because, again, we, certainly, don't want to permit elected officials to violate constitutional rights and then claim Eleventh Amendment

immunity, and yet at the same time there is the requirement that we provide individuals with notice of any injunction, And so there is that tension there.

THE COURT: That has to be solved by a declaratory -- declaratory relief --

MR. KALOYANIDES: Right.

THE COURT: -- Request. But we're not there yet.

So let's go as to the merits themselves of the practice here. There is two different approaches that are taken by the two parties. The central argument is whether or not the practice by the School Board falls under the so-called school prayer line of cases which originated with *Engel*, *Schempp* and then *Lemon* and resulted in the so-called *Lemon* test, Or whether or not it falls under the line of cases that begin with Marsh and culminate, most recently, in the *Town of Greece* decision by the supreme court.

So I guess I will ask the defendants in this case what is -- why shouldn't this be considered under the line of cases that have to do with prayer in schools as opposed to prayers at the start of legislative sessions?

MR. PEFFER: Thank you, your Honor. Essentially, this asks the Court to decide whether this is a school function, if you will, which is the plaintiffs' position, essentially, it's a school. It's a school. It's a school whether it's a school board meeting, football, or in the

classroom itself. And here we have a, clearly, legislative body. There's nothing that distinguishes this body in terms of rule making of elected officials of providing rules and governance for a school district from a city council who is providing rules and governance for a community, a city.

THE COURT: This is my problem with that position: It's undisputed that school board meetings are -- affect students, and the line of cases that have to do with school prayer, a large factor that is considered whether to allow prayer is the effect -- the presumed or potential coercive effect of that prayer on people who are not mature adults.

If you look at the line of cases with *Marsh*, and even in *Town of Greece*, the way that Justice Kennedy distinguished *Lee* under that in *Town of Greece* had to do with primarily with the fact that in legislative functions there are mature adults present, so the coercive or indoctrinating effect of prayer would not be as present or as severe when it relates to mature adults as with when it relates to minors.

So we have a situation here in which, obviously, school board meetings, primarily, have to do with educating minors. Minors are present. There's a representative of the students who is a member or is a participant in the school board, so how can you say, then, that it's reconciled as a strictly legislative function when the distinguishing feature of *Lee* and that line of cases have to do with the effects on

minors.

MR. PEFFER: Well, your Honor, there's no question that the line of cases that have held that school prayer at graduations and in the classroom, et cetera, football games, has the more control by the district upon the students. Whereas here, this is a primarily an adult meeting. Yes, children can come, just as in *Town of Greece* children could go to the -- and were at regularly at the city council meeting, But here you don't have the coercive effect. There's not -- they're not trapped there.

THE COURT: Let me stop you there. When you compare school board meetings to, say, the graduation case or the football game case, isn't it exactly the opposite of that? Isn't the fact that it is a school board meeting, isn't that more inherently coercive because you have the full authority of the entire district before the student as opposed to a graduation or opposed to a football game? Isn't there in the school board setting a specifically pronounced power and balance between the board and the student, which would be more inherently coercive of a practice such as yours?

MR. PEFFER: Except that in the -- in this case the students aren't required to be there. This is not a requirement. They can avoid the prayer as can offended parties avoid the prayer.

THE COURT: That was the same argument that was made

in the graduation and in the football game. I mean, the fact that you put a student in the situation, whether to comply or leave, is not really a choice for the student.

MR. PEFFER: I understand that. But still there's a distinction in that they are not required to be there; whereas, the football game, it is a part of the process, part of their educational activities.

THE COURT: But there's no requirement that students attend football games except for the team, the band, and the cheerleaders, as the case pointed out. And there's no requirement, strictly speaking, that they go to graduation to receive their degree. So how is this any different as far as being forced to go?

MR. PEFFER: Because this meeting is not designed as is a graduation and a football to cater to students. It's designed to govern the school district. So yes, your Honor is correct in that it does have more to do with students, but it is not designed to have children -- have the minors present, although they are entitled to be there; whereas, a football game is designed to attract the school and bring students there, as a graduation is fairly well required if you want to associate with your degree and your diploma, et cetera. And so here, with respect to the school board meeting, that's not the design of this meeting.

THE COURT: Well, I can't think of any activity

that's more affected -- that more affects the students than school board meetings in a larger sense because school board meetings is where policies are made, where awards are made, where discipline is meted out, and where the school board becomes, sort of, the imposing authority that affects primarily the students lives.

MR. PEFFER: Well, in the *Town of Greece* they recognize students as well and that did not pose a problem to the decision.

THE COURT: But the *Town of Greece* had not to do with a school board, it had to do with a city council. So that body wasn't specifically tasked with the job of instituting, enforcing, and setting policy with respect to students particularly.

MR. PEFFER: But the setting of the policy, it would -- it's our contention that the setting of the policy and the idea of solemnizing the occasion by an invocation beginning the meeting, that -- those two are not inconsistent with one another. Yes, the school -- that is what they're elected to do. Yes, they are elected to govern a school board. But the fact that they open this meeting of governance with an invocation is more consistent with the *Town of Greece* than it is with the football and graduation ceremonies.

THE COURT: Okay. I understand your argument. My problem with that is, going back to *Marsh*, it seems to be that,

you know, the decision in *Marsh*, and to a large extent the decision in *Town of Greece*, had to do with a historical acceptance of invocations before legislative bodies. There's also mention even several days before the first amendment was enacted there was an invocation.

So *Marsh* has been described as, sort of, an exception because of the longstanding tradition of invocations at legislative sessions. I don't think see this as being within that line. I mean, a school board is not in that sense -- there's no tradition going back 200 years of invocation of prayers at school board meetings, So to the extent *Town of Greece* extended that tradition to local legislative bodies, I'm not sure that the next step is appropriate.

What is your response?

MR. PEFFER: My thought is that that is the next -- that is the obvious next step. It is a local governmental body, a legislative -- doing a legislative function, and, therefore, the history of the legislative session will apply equally to the school district as it does to a city council meeting.

THE COURT: The problem with that is there's an equally established history with respect to students that go against the imposition of prayer when the lives of students are concerned. You have, sort of, contrary traditions, if you will. So to the extent there's a tradition for legislative

bodies, there's also particular care that's being taken by the supreme court in not exposing students to the imposition of religion by the formal bodies to which they encounter.

MR. PEFFER: Well, and the invocation is by nature -- its purpose is not there to address the students. It is not there -- that's not the function. It's there to solemnize the occasion, to direct it to -- as with the legislative exception set forth in *Town of Greece* and *Marsh*, it's geared toward the legislative body, not towards the students or the audience.

THE COURT: Very well. I understand. So what I'm going to do is this: I'm going to order additional briefing specifically on the issue of standing. I'll give plaintiffs one week from today to submit additional supplemental information regarding specific exposure to specific meetings, perhaps by date and the person that invoked the prayer, if that can be ascertained, during that meeting. And also the source, amount and justification for the request of nominal damages the plaintiff should include that in a brief, not to exceed ten pages in length, to be submitted no later than a week from today.

The defendants will then have an additional week to respond to that evidence in the same format, no longer than a ten-page brief. And then at that time, once both briefs are submitted two weeks from today, the matter will stand submitted.

Thank you.

MR. KALOYANIDES: Your Honor, one clarification. We have some pretrial motion deadlines coming up. Should we vacate the current trial date in light of the additional briefing?

THE COURT: Yeah. When is the trial set for in this case?

MR. KALOYANIDES: It's January 5th, I believe.

THE COURT: Let's vacate the trial. I think, you know, the case is ripe for summary judgment one way or the other. So let's vacate the trial date. In the event that I decide that there are remaining disputed issues of fact, then I'll reset the dates in my order.

MR. KALOYANIDES: Thank you, your Honor.

MR. PEFFER: Thank you, your Honor.

THE COURT: Thank you.

(Proceedings Concluded.)

CERTIFICATE OF OFFICIAL REPORTER

I, ADELE C. FRAZIER, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 12th DAY OF APRIL, 2017

/s/ ADELE C. FRAZIER

____________________________________

ADELE C. FRAZIER, CSR No. 9690, CRR, RMR

FEDERAL OFFICIAL COURT REPORTER