**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., <br> *Plaintiff-Appellee*, <br><br> v. <br><br> CHINO VALLEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION; JAMES NA, Chino Valley Unified School District Board of Education Board Member in his official representative capacity; SYLVIA OROZCO, Chino Valley Unified School District Board of Education Board Member in her official representative capacity; CHARLES DICKIE, Chino Valley Unified School District Board of Education Board Member in his official representative capacity; ANDREW CRUZ, Chino Valley Unified School District Board of Education Board Member in his official representative capacity; IRENE HERNANDEZ-BLAIR, Chino Valley Unified School District Board of Education Board Member in her official representative capacity, <br><br> *Defendants-Appellants.* | No. 16-55425 <br><br> D.C. No. 5:14-cv-02336-JGB-DTB <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted November 8, 2017
Pasadena, California

Filed July 25, 2018

Before:  M. Margaret McKeown and Kim McLane
Wardlaw, Circuit Judges, and Wiley Y. Daniel,[*] District
Judge

Per Curiam Opinion

---

[*] The Honorable Wiley Y. Daniel, United States District Judge for
the U.S. District Court for Colorado, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's grant of summary judgment and injunctive relief in favor of plaintiffs in an action challenging a school board's policy and practice of permitting religious exercise during board meetings, including a religious prayer at meetings that are open to the public and that include student attendees and participants.

The panel held that the school board's prayer policy and practice violate the Establishment Clause.  The panel held that the religious invocations to start the open portions of Board meetings are not within the legislative-prayer tradition that allows certain types of prayer to open legislative sessions.  The panel noted that this was not the sort of solemnizing and unifying prayer, directed at lawmakers themselves and conducted before an audience of mature adults free from coercive pressures to participate, that the legislative-prayer tradition contemplates.  Instead, these prayers typically took place before groups of schoolchildren whose attendance was not truly voluntary and whose relationship to school district officials, including the Board, was not one of full parity.  Applying the three-pronged test first articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13 (1971) for determining whether a governmental policy or action is an impermissible establishment of religion, the panel concluded that the prayer policy lacked a secular legislative purpose and therefore, under *Lemon*, violated the Establishment Clause.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the district court's injunction, which enjoined board members "from conducting, permitting or otherwise endorsing school-sponsored prayer in Board meetings," was not overbroad because it was limited to restricting only speech that constituted a governmental establishment of religion.

## COUNSEL

Robert H. Tyler (argued), Jennifer L. Bursch, and James A. Long, Tyler & Bursch LLP, Murietta, California, for Defendants-Appellants.

David J. Kaloyanides (argued), David J.P. Kaloyanides APLC, Chino, California, for Plaintiff-Appellee.

Deborah J. Dewart, Swansboro, North Carolina; James L. Hirsen, Anaheim Hills, California; for Amicus Curiae Justice and Freedom Fund.

Helgi C. Walker, Sean J. Cooksey, Kian J. Hudson, and Nick Harper, Gibson Dunn & Crutcher LLP, Washington, D.C.; Kristen K. Waggoner and Brett Harvey, Alliance Defending Freedom, Scottsdale, Arizona; David A. Cortman, Alliance Defending Freedom, Washington, D.C.; for Amicus Curiae Alliance Defending Freedom.

Francis J. Manion and Geoffrey R. Surtees, American Center for Law and Justice, New Hope, Kentucky; Edward L. White III and Erik M. Zimmerman, American Center for Law and Justice, Ann Arbor, Michigan; for Amicus Curiae American Center for Law and Justice.

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia, for Amicus Curiae Congressional Prayer Caucus Foundation.

James G. Abernathy, Olympia, Washington; Mark Goldfeder and Anton Sorkin, Restoring Religious Freedom Project, Atlanta, Georgia; for Amici Curiae Law and Religion Practitioners.

Richard B. Katskee, Eric Rothschild, and Kelly M. Percival, Americans United for Separation of Church and State, Washington, D.C.; Steven M. Freman, David L. Barkey, and Michelle N. Deutchman, Anti-Defamation League, New York, New York; Daniel Mach and Heather L. Weaver, American Civil Liberties Union Foundation, Washington, D.C.; Peter Eliasberg, ACLU of Southern California, Los Angeles, California; Brendan Hamme, ACLU of Southern California, Santa Ana, California; for Amici Curiae Americans United for Separation of Church and State; American Civil Liberties Union; ACLU of Southern California; Anti-Defamation League; Central Conference of American Rabbis; Hadassah, The Women's Zionist Organization of America, Inc.; Interfaith Alliance; Hindu American Foundation; Jewish Social Policy Action Network; Union for Reform Judaism; and Women of Reform Judaism.

## OPINION

PER CURIAM:

The Establishment Clause serves intertwined purposes, pertaining to individual freedom and the democratic nature of our system of government.  The Clause protects "the individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience." *Wallace v. Jaffree*, 472 U.S. 38, 49 (1985).  It likewise ensures that the government in no way acts to make belief—whether theistic or nontheistic, religious or nonreligious—relevant to an individual's membership or standing in our political community.  *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).  The Establishment Clause, grounded in experiences of persecution, affirms the fundamental truth that no matter what an individual's religious beliefs, he has a valued place in the political community.

These principles are central to our analysis in the context of public schools.  Because children and adolescents are just beginning to develop their own belief systems, and because they absorb the lessons of adults as to what beliefs are appropriate or right, we are especially attentive to Establishment Clause concerns raised by religious exercise in the public-school setting.

This case implicates just such concerns.  Freedom From Religion Foundation, two parents of students in the district, and twenty Doe plaintiffs—students, parents, district employees, a former district employee, and attendees of school board meetings (collectively "the Foundation")— challenge a religious exercise at a local school board's meetings—including a prayer in the portion of the meeting that is open to the public and that includes student attendees

FREEDOM FROM RELIGION FOUND. V. CHINO VALLEY USD   7

and participants. The Chino Valley Unified School District Board of Education ("Chino Valley" or "the Board") appeals the district court's grant of summary judgment to the Foundation on its Establishment Clause claim and challenges the scope of the injunctive relief ordered by the district court. They also seek to vacate, as moot, a separate portion of the district court's judgment, declaring that the Board's policy and custom of prayer and Bible readings at its meetings violates the Establishment Clause. We affirm the district court's judgment.

## I.  Background

The Board is the governing body for the school district and accordingly oversees all district schools. *See* Cal. Educ. Code § 35010. The Board holds roughly eighteen public meetings per year. These meetings for some period of years included a public prayer, until enjoined by the district court. In October 2013, the Board adopted an official policy regarding the prayer practice, permitting an invocation at each Board meeting and providing a means for the Board to select the prayer-giver. The Board's policy and practice of prayer are at issue in this appeal.

### A.  Board Meetings

The Board meetings share a familiar structure.[1] After a roll call and opportunity for public comment on closed-session items, the first portion of the meeting is closed to the public. During this time, the Board's five adult, non-student members make decisions on student discipline, including

---

[1] We describe here the structure for regular sessions of the Board. Occasional "special meetings" do not follow this structure—notably, they usually if not always lack a closed-session component. Those Board meetings also often involve prayer.

suspension and expulsion, student readmission, negotiations with the employee labor union, and hiring, firing, and discipline of district personnel.

The open portion of the meetings begins with a report by the Board president on the preceding closed session.  Next, a member of the school community—sometimes, a student—recites the Pledge of Allegiance, and the Junior Reserve Officers' Training Corps presents the colors.  Then, there is an opening prayer, usually led by a member of the clergy.  On occasion, a Board member or member of the audience leads the prayer instead.[2]

A "student showcase"—presentations by classes or student groups from the district—often follows the opening prayer.  At times, the Board also sets aside time for "student recognition," to highlight the academic and extracurricular accomplishments of students in the district.  Following comments by the student representative and employee representatives, there is a period for public comment. The Board then conducts its business of making decisions regarding district administration.  At one typical meeting, it

---

[2] Chino Valley's prayer policy provides that the Board president may select a Board or audience member as a volunteer if the selected clergy member does not appear.  The policy also prohibits the Board from "engag[ing] in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker."  It appears that these limitations on non-clergy were not always followed, however.  For example, in September 2014, eleven months after the adoption of the prayer policy, a pre-selected community member gave the invocation and then received a recognition plaque from the Board for, according to the Board minutes, "his continued support and prayers for the Chino Valley Unified School District."  The then-Board president disclosed during the meeting that he had requested that the community member focus the prayer on the district's ongoing negotiations with the school employees' association.

approved fundraising activities, field trips, the chemistry textbook, course revisions and new courses, the expulsion of two students, a bid for asphalt slurry seal at certain facilities, the revision of the use-of-school-facilities policy, and personnel items.  During this time, the Board also approves student discipline and readmission cases, and requests for waiver of high school graduation requirements.  The meeting closes with "communications"—public statements by each of the adult Board members to the school community.  Very occasionally, a second closed session occurs after the open portion.

Both the student showcase and the student recognition components of the meeting center on the accomplishments of students of all ages—from elementary school to high school—who are in attendance.  Musical or dance performances by elementary school students are common.  For example, at one meeting second-graders sang folk songs; another meeting featured the elementary school's advanced band students.  Sometimes, the "student showcase" is academic.  Elementary and high school students make presentations to the Board on their studies in innovative classes.  The student recognition portion celebrates both academic and extracurricular achievements.  The Board has honored the district's elementary school and high school science fair winners, recipients of college scholarships, and the district high school student with the highest GPA.  It has also recognized the Chino High School girls' varsity softball team, Cub Scout award recipients, winners of an elementary school art contest and school read-a-thons, and high school students fundraising for breast-cancer research.

The Board's student representative is also an active participant in the meetings. She[3] is president of the Student Advisory Council and sits on the Board to represent student interests. The student representative votes with the Board in the open session, though her vote is recorded separately. During the period for comment at meetings, she discusses issues of importance to the student community.

The Board meetings are open to any member of the public. Cal. Gov't Code § 54954.3. They are also broadcast on local television.

### B. The Board's Prayer Policy and Practice

The Board has included prayer as part of its meetings at least since 2010. In September 2013, the Foundation sent the Board a letter requesting that it "refrain from scheduling prayers as part of future school board meetings." One month later, the Board adopted a policy regarding invocations at board meetings. The prayer policy provides for prayer delivery "by an eligible member of the clergy or a religious leader in the boundaries of" the district. Should the selected member of the clergy not appear, the Board president can solicit a volunteer from the Board or audience.

The Board selects clergy for each meeting pursuant to a list of eligible local religious leaders and chaplains kept by the superintendent's designee. The designee compiles this list, under the terms of the policy, by 1) looking through a commercial phone book "for 'churches,' 'congregations,' or other religious assemblies"; 2) collating "research from the Internet"; and 3) consulting with "local chambers of

---

[3] For both the 2013–2014 and 2014–2015 academic years, the student representative was a young woman.

commerce." Any "religious assembl[y] with an established presence" in Chino Valley is eligible, and a religious entity can write to the superintendent's designee to ensure that it is on the list. All chaplains for fire departments and law enforcement agencies in Chino Valley and "any nearby military facilities" are automatically on the list. Once a year, the designee mails an invitation to pray at Board meetings to the "religious leader" of each congregation on the list, as well as to all the chaplains. The policy provides both that clergy are "scheduled on a first-come, first-serve, or other random basis" and that the "designee shall make every reasonable effort to ensure that a variety of eligible invocational speakers are scheduled." No single individual may be scheduled to pray at consecutive meetings, or at more than three per year. The Board adopted its prayer policy unanimously. All five adult members of the Board voted in favor; the student representative also voted for its adoption.

Invited clergy have typically given the prayers. However, Board members gave the opening prayer at least four times after the adoption of the policy. The president of the California School Employees Association and the district's director of secondary curriculum also provided opening prayers on different occasions. At least twice, community members gave prayers.

### C. Expression of Religious Beliefs at Board Meetings

Historically—including after the adoption of the prayer policy, and during the pendency of the litigation now before us—Board members' invocation of Christian beliefs, Bible readings, and further prayer were a regular feature of Board meetings. Board members stressed that they viewed such religious engagement as central to the mission and life of the

school community.   In a meeting in February 2014, following adoption of the prayer policy, Board member Andrew Cruz stated, "I think there are very few districts of that powerfulness of having a board such as ourselves having a goal.  And that one goal is under God, Jesus Christ."  At another meeting, then-Board president James Na "urged everyone who does not know Jesus Christ to go and find Him."  Na informed the assembled audience in May 2014, "God appointed us to be here—whether you to be teachers, or our staff members, or our principals, or our directors, assistant superintendents . . . ."   At another meeting, he instructed the teachers and the assembled audience: "anything you desire, depend on God."   Cruz publicly thanked a school principal "for placing God before herself and praying for every classroom on Saturday."

During Board meetings from 2013 to 2015, Na and Cruz regularly endorsed prayer, read Bible verses, and reaffirmed their Christian beliefs.  A third member of the five-member Board that approved the prayer policy, Charles Dickie, gave the invocation at the Board meetings at least three times and was identified by Na as a future "neighbor . . . in heaven," after Na discussed Dickie's missionary work in Africa at a Board meeting.  No Board member sought to halt any of the religious comments.

The religious discussion at Board meetings included specific comments on the opening prayers given by outside clergy.  At a June 2013 meeting, Cruz stated that the pastor who had given the opening invocation "was right, in his prayers, that I need [to] first look up to Jesus Christ for serving our students."   At another meeting following the adoption of the prayer policy, Na thanked the Christian pastor who gave an opening prayer "for your serving the Lord Jesus Christ and serving all of our students because we do need your prayers [on a] daily basis."

FREEDOM FROM RELIGION FOUND. V. CHINO VALLEY USD 13

Na and Cruz's explicit linkages of the work of the Board, teachers, and the school community to Christianity, and their endorsement of prayer by the faculty, were frequent. Minutes from one meeting state that Cruz "praised personnel for putting God first." On another occasion, Cruz described "one voice united in prayer at Chino," and read Romans 15:6—"so that with one mind and one voice you may glorify the God and Father of our Lord Jesus Christ"—to the Board-meeting audience.[4]

In the course of Board meetings, preaching to the district community and biblical readings by the Board members were also common. At one meeting, Na stated that he thought a deceased community member "wanted you, all the TV viewers and our friends to hear again," and then read, John 3:16.[5] Cruz, at another meeting, stated to the audience: "If we have confessed our sins and ask God's forgiveness, we simply need to keep a forward focus toward the goal of pleasing Christ." At yet another meeting, Cruz told the audience: "Christ died for our sins, according to the scripture, and . . . he was buried, and . . . he was raised on the third day, according to the scripture. Now that is the gospel." Another time, he instructed the audience "that the two greatest commandments are to [l]ove the Lord your God

---

[4] The record does not provide the specific translation from which Cruz read. This version of Romans 15:6 is from the New International Version. Other translations are substantially similar. *See, e.g.*, Romans 15:6 (New Revised Standard Version) ("So that together you may with one voice glorify the God and Father of our Lord Jesus Christ."); Romans 15:6 (King James) ("That ye may with one mind and one mouth glorify God, even the Father of our Lord Jesus Christ.").

[5] This verse sets forth a key tenet of Christian belief: "For God so loved the world that he gave his only Son, so that everyone who believes in him may not perish but may have eternal life." John 3:16 (New International Version).

with all your heart, all your soul, all your strength, and all
your mind" and to "[l]ove your neighbor as yourself."
During the comment period at one meeting, Na "thanked
God for sending his son Jesus Christ so that our sins are
forgiven and [we] may have eternal life in heaven."  He also
described a news story about a murder in order to instruct the
audience as to "how much we need God in today's society."
The record contains at least fourteen instances in which Cruz
read Bible verses to the assembled district community during
the period set aside for Board-member comment.

## D.  Procedural Background

The Foundation brought this suit against the school
district and, in their official capacities, the (adult) Board
members, in November 2014.  The Foundation alleged that
the Board's policy and custom of opening board meetings
with prayer, as well as its policy and custom of including
Bible reading and preaching in meetings, violated the
Establishment Clause, the Fourteenth Amendment's Equal
Protection Clause, and the California Constitution.  It sought
declaratory and injunctive relief, as well as nominal
damages.

The district court granted partial summary judgment for
the Foundation on the Establishment Clause claim[6] and
enjoined the current Board members "in their official
representative capacities . . . from conducting, permitting or
otherwise endorsing school-sponsored prayer in Board
meetings."  The court also entered a declaratory judgment

---

[6] The Foundation did not press its independent equal-protection
claim on its motion for summary judgment, and the district court granted
summary judgment solely on Establishment Clause grounds.  The
Foundation has not pursued its equal-protection claim on appeal.  Thus,
we do not consider it here.

that the prayer policy "and the policy and custom of reciting prayers, Bible readings, and proselytizing at Board meetings" violated the Establishment Clause. The district court dismissed all claims against the Board and all state claims against the Board members in their official capacities as barred by the Eleventh Amendment. All claims against a former Board member, who left the Board during the pendency of the district court proceedings, were likewise dismissed. The Board and Board members, including the former Board member, appealed.

## II. Standing

At the outset, while the Foundation does not challenge appellate standing, we evaluate it pursuant to our "special obligation to satisfy [ourselves] of [our] own jurisdiction . . . ." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (citation and internal quotation marks omitted). The Board and its former Board member lack standing to appeal. As described above, all claims against them were dismissed, and they lack any ongoing obligations pursuant to the district court's judgment. *See United States v. Windsor*, 570 U.S. 744, 759–60 (2013). Nevertheless, the remaining Board members possess appellate standing.[7] The ongoing obligations placed upon the Board members by the district court's judgment give the current Board members a

---

[7] *Bender v. Williamsport Area School District*, 475 U.S. 534 (1986), is not inapposite. There, the Supreme Court concluded that a sole board member did not have appellate standing to challenge a decision against the board, where the board had voted not to challenge the district court's decision but where the individual board member wished to pursue the appeal on the board's behalf. Here, the Board joined in the Notice of Appeal, and the district court enjoined the Board members in their "individual representative capacities." We are thus confident that this case is materially distinguishable from *Bender*.

"direct stake in the outcome of their appeal." *Hollingsworth v. Perry*, 570 U.S. 693, 705–06 (2013). Because at least one party with appellate standing asserts each challenge to the district court's decision, we have jurisdiction to evaluate the merits of each of the appellants' claims. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009).

## III.    The Establishment Clause Claim

We review, first, the Board members' appeal of the district court's grant of summary judgment to the Foundation on its Establishment Clause claim regarding the Board's policy and practice of starting the open portion of Board meetings with an invocation. Our review of a district court's decision on cross-motions for summary judgment is de novo. *Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011). We "view[] the evidence in the light most favorable to . . . the nonmoving party" and evaluate "whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.* (quoting *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)).

The Board's prayer policy and practice violate the Establishment Clause. The invocations to start the open portions of Board meetings are not within the legislative-prayer tradition that allows certain types of prayer to open legislative sessions. This is not the sort of solemnizing and unifying prayer, directed at lawmakers themselves and conducted before an audience of mature adults free from coercive pressures to participate, that the legislative-prayer tradition contemplates. *See Marsh v. Chambers*, 463 U.S. 783 (1983); *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). Instead, these prayers typically take place before groups of schoolchildren whose attendance is not truly

voluntary and whose relationship to school district officials, including the Board, is not one of full parity.

Because prayer at the Chino Valley Board meeting falls outside the legislative-prayer tradition, we apply the three-pronged test first articulated in *Lemon v. Kurtzman* for determining whether a governmental policy or action is an impermissible establishment of religion. 403 U.S. 602, 612–13 (1971); *see also Newdow v. U.S. Congress*, 328 F.3d 466, 487 (9th Cir. 2003). We hold that the Chino Valley Board's prayer policy lacks a secular legislative purpose and therefore, under *Lemon*, violates the Establishment Clause. Accordingly, we uphold the district court's grant of summary judgment to the Foundation on this claim.

## A.  The Legislative Prayer Tradition

The Board members argue that the Board's prayer practice falls within the legislative-prayer tradition identified in *Marsh v. Chambers*, 463 U.S. 783 (1983), and *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).[8]

---

[8] The Board members do not identify any other tradition of historical practice consonant with the Establishment Clause that might permit prayer during school-board meetings. That is not surprising, given the Establishment Clause jurisprudence proscribing prayer in school settings. *See, e.g.*, *Engel v. Vitale*, 370 U.S. 421 (1962) (holding the recitation in school of a prayer composed by state officials a religious exercise in violation of the Establishment Clause); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963) (holding that recitation of the Lord's Prayer or Bible readings at the start of the school day violated the Establishment Clause); *Jaffree*, 472 U.S. at 38 (holding a state statute authorizing silence at the start of the school day for meditation or prayer in violation of the Establishment Clause); *Lee v. Weisman*, 505 U.S. 577 (1992) (holding that a prayer incorporated into a high-school graduation ceremony violated the Establishment Clause); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) (same, for prayer prior to a high-school football game).

Under the *Marsh-Greece* framework, "prayer practice [that] fits within the tradition long followed in Congress and the state legislatures" is not subject to typical Establishment Clause analysis because such practice "was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 134 S. Ct. at 1819. Accordingly, the Supreme Court has found prayer at the start of state legislative sessions and town board meetings commensurate with that tradition and not in violation of the Establishment Clause. *Marsh*, 463 U.S. at 795; *Town of Greece*, 134 S. Ct. at 1815.

*Marsh* and *Town of Greece* together identify certain characteristics of setting and content that mark legislative prayer. The prayer occurs "at the opening of legislative sessions," in order to "lend gravity to the occasion" and "invite[] lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing." *Town of Greece*, 134 S. Ct. at 1823. The audience consists of "mature adults" who during the prayer are "free to enter and leave with little comment and for any number of reasons." *Id.* at 1827 (citation and internal quotation marks omitted); *Marsh*, 463 U.S. at 793 (emphasizing that "the individual claiming injury . . . is an adult"); *see also Schempp*, 374 U.S. at 299–300 (Brennan, J., concurring) (distinguishing legislative prayer from prayers in schools on the ground that "[l]egislators . . . are mature adults who may presumably absent themselves from such public and ceremonial exercises without incurring any penalty, direct or indirect"). The Court has distinguished the atmosphere in which legislative prayer occurs from that of a school function in which district personnel "retain a high degree of control over" the event. *Lee v. Weisman*, 505 U.S. 577, 597 (1992); *see also Town of Greece*, 134 S. Ct. at 1827 (distinguishing *Lee*, 505 U.S. at 592–94, which held prayer at a high school graduation in violation of the Establishment

FREEDOM FROM RELIGION FOUND. V. CHINO VALLEY USD 19

Clause, as involving an event in which "school authorities maintained close supervision over the conduct of the students and the substance of the ceremony"). The legislative prayer itself is a "symbolic expression," *Town of Greece*, 134 S. Ct. at 1818, not a time "to proselytize or advance any one, or to disparage any other, faith or belief," *id.* at 1823 (quoting *Marsh*, 463 U.S. at 794–95).

Three other circuits have previously evaluated whether prayer during the meeting of a public school board falls within the *Marsh-Greece* legislative-prayer tradition. The Third and Sixth Circuits both have held legislative-prayer analysis inapplicable to prayer practices at school-board meetings. *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 275 (3d Cir. 2011), *cert. denied*, 565 U.S. 1157 (2012); *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 371 (6th Cir. 1999).[9] While the Fifth Circuit more recently held that a school board's prayer practice constituted legislative prayer consistent with the terms of the *Marsh-Greece* exception, it distinguished *Indian River* and *Coles* on the ground that, in both those cases, a student representative sat on the school board. *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 528 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 470.[10] The Fifth Circuit too, then, has suggested that where a student is a board member, prayer at board meetings may

---

[9] Although *Coles* and *Indian River* predated *Town of Greece*, they are consistent in reasoning with that later decision.

[10] In addition, *McCarty* featured student-led invocations, as opposed to the Chino Valley Board's practice, as a policy matter, of selecting a religious leader to be the prayer-giver. *See* 851 F.3d at 523–25.

present constitutional difficulties.  Here, there is a student representative at every meeting.[11]

In evaluating whether the identified historical tradition of legislative prayer does indeed encompass a particular prayer practice, we must undertake a "fact-sensitive" inquiry, in which we take into account "the setting in which the prayer arises and the audience to whom it is directed," the content of the prayer, and "the backdrop of historical practice."  *Town of Greece*, 134 S. Ct. at 1825.[12]  This approach is consistent with the analysis undertaken by each of the three circuits that have previously addressed prayer at school-board meetings.  *See McCarty*, 851 F.3d at 528 n.21 (emphasizing the "delicate and fact-sensitive" nature of Establishment Clause jurisprudence (quoting *Lee*, 505 U.S. at 597)); *Indian River Sch. Dist.*, 653 F.3d at 265 (examining the "environment [in which] the School Board delivers its prayers"); *Coles*, 171 F.3d at 382 (considering "what actually takes place at meetings of the school board").  Upon undertaking this analysis, we find that the practice of prayer at Chino Valley Board meetings does not "fit[] within the tradition long followed in Congress and the state

---

[11] The Board's citation to the unpublished *Bacus v. Palo Verde Unified School District Board of Education*, 52 F. App'x 355 (9th Cir. 2002) is misplaced, as we declined to decide in that case whether the legislative-prayer exception could apply to prayer at a school-board meeting.

[12] While the specific quoted language is from a portion of the opinion joined by only three Justices, the fact-sensitive nature of the Establishment Clause inquiry generally and *Marsh-Greece* analysis in particular is not in doubt.  The majority opinion in *Town of Greece* engaged in such analysis, evaluating "the prayer opportunity as a whole." 134 S. Ct. at 1824.  Additionally, no opinion in the case called into question a fact-specific approach.  *Id.* at 1838 (Breyer, J., dissenting) ("As we all recognize, this is a 'fact-sensitive' case.").

legislatures." *See Town of Greece*, 134 S. Ct. at 1819.  The audience and timing of the prayers, as well as the religious preaching at the Board meetings, diverge from the legislative-prayer tradition; and the history of the legislative-prayer tradition is inapplicable to a public school board.  We therefore conclude that the *Marsh-Greece* exception does not control or govern our analysis.

## B.  No Legislative Prayer Exception

The setting of legislative prayers—"at the opening of legislative sessions," where the audience comprises "mature adults" who are "free to enter and leave with little comment and for any number of reasons"—only dimly resembles that of Chino Valley Board meetings.  *Town of Greece*, 134 S. Ct. at 1823, 1827 (citation and internal quotation marks omitted).  The Board's meetings are not solely a venue for policymaking, they are also a site of academic and extracurricular activity and an adjudicative forum for student discipline.  Consequently, many members of the audience—and active participants in the meetings—are children and adolescents whose attendance is not truly voluntary and whose relationship with the Board is unequal.  Unlike a session of Congress or a state legislature, or a meeting of a town board, the Chino Valley Board meetings function as extensions of the educational experience of the district's public schools.  The presence of large numbers of children and adolescents, in a setting under the control of public-school authorities, is inconsonant with the legislative-prayer tradition.

Both *Marsh* and *Town of Greece* emphasize that the audience for the prayers at issue consisted of adults—"adult citizens, firm in their own beliefs," who consequently could "tolerate and perhaps appreciate" legislative prayer.  *Town of Greece*, 134 S. Ct. at 1823; *see also Marsh*, 463 U.S. at

792. As *Town of Greece* explained, "[a]dults often encounter"—and, our law presumes, are well-equipped to handle—"speech they find disagreeable." 134 S. Ct. at 1826. For adults, legislative prayer does not pose an insurmountable constitutional problem, because adults "presumably are not readily susceptible to religious indoctrination or peer pressure." *Id.* at 1827 (quoting *Marsh*, 463 U.S. at 792).

We have always, though, been careful to distinguish the special Establishment Clause difficulty posed by requiring children and adolescents to make this choice—particularly in a school setting. *See, e.g.*, *Lee*, 505 U.S. at 593; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310–13 (2000); *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759, 762 (9th Cir. 1981); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1104 (9th Cir. 2000); *see also Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.").

*Lee* makes clear that we draw this distinction because we recognize that minors' beliefs and actions are often more vulnerable to outside influence. 505 U.S. at 593–94. *Marsh* contrasted the adult plaintiff's relative lack of vulnerability to potential coercion with children's susceptibility to indoctrination and peer pressure. 463 U.S. at 792 (relying on Establishment Clause analysis, in prior cases, predicated on children's vulnerability to coercion).[13] Because

---

[13] As to those cases, *Tilton v. Richardson*, 403 U.S. 672 (1971), found significant that college students were "less impressionable and less susceptible to religious indoctrination" than primary and secondary students, in the course of evaluating the constitutionality of federal aid to colleges and universities connected to religious institutions. *Id.* at 686.

children's "experience is limited," their "beliefs consequently are the function of environment as much as of free and voluntary choice." *Sch. Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373, 390 (1985), *overruled on other grounds by Agostini v. Felton*, 521 U.S. 203 (1997).

Even for older adolescents, "our history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults." *J.D.B. v. North Carolina*, 564 U.S. 261, 274 (2011) (internal quotation marks omitted). We recognize, in a variety of legal contexts, children's and adolescents' greater susceptibility to peer pressure and other pressures to conform to social norms and adult expectations. *See, e.g.*, *id.* at 271–72; *Roper v. Simmons*, 543 U.S. 551, 569 (2005).

The audience for the prayers at issue in this case differs markedly from that at the legislative sessions in *Marsh* and *Town of Greece* in that many of the attendees at Chino Valley Board meetings are adolescents and children—some as young as second grade. The presence of these children is integral to the meeting: they perform for the Board, assembled audience, and television viewers; they receive awards; and one among their number sits on the Board and participates in the Board's deliberative process. This audience, unlike the audience in the legislative-prayer cases, therefore implicates the concerns with mimicry and coercive pressure that have led us to "be[] particularly vigilant in monitoring compliance with the Establishment Clause." *Aguillard*, 482 U.S. at 583–84. Government-sponsored

Justice Brennan's concurrence in *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203 (1963), emphasized child development experts' understanding that "children are disinclined at this age to step out of line or to flout peer-group norms," particularly "where important group norms and values are involved." *Id.* at 290 & n.69.

prayer in this context therefore poses a greater Establishment
Clause problem than prayer at the legislative sessions in
*Marsh* and *Town of Greece*.

The prayer audience at Chino Valley Board meetings
differs from that at legislative sessions not only in age but
also in its relationship with the policy-making body. The
nature of the Board's mandate, and the Board's relationship
to the population whom it serves, are dissimilar from the
function of Congress, a state legislature, or a town board and
the relationships of those bodies to their constituents.

Unlike legislative entities for which legislative prayer is
constitutionally permissible, school districts—and by
extension, school boards—exercise control and authority
over the student population. *C.A. v. William S. Hart Union
High Sch. Dist.*, 270 P.3d 699, 704 (Cal. 2012) ("A school
district and its employees have a special relationship with the
district's pupils" in part due to "the comprehensive control
over students exercised by school personnel." (citation and
internal quotation marks omitted)). California law provides:
"Every school district shall be *under the control* of a board
of school trustees or a board of education." Cal. Educ. Code
§ 35010 (emphasis added). The school board's power
extends to "initiat[ing] and carry[ing] on any program [or]
activity" or "otherwise act[ing] in any manner which is not
in conflict with or inconsistent with" law or "the purposes
for which school districts are established." *Id.* § 35160.

In California, any "employee of a school district"—that
is, a person employed by the Board—may exercise over
students "the amount of physical control reasonably
necessary . . . to maintain proper and appropriate conditions
conducive to learning." Cal. Educ. Code § 44807. Beyond
direct physical control, the school district also holds a more
subtle power over the students' academic and professional

FREEDOM FROM RELIGION FOUND. V. CHINO VALLEY USD 25

futures, which manifests itself in the program at Board
meetings.  For example, the Board's power to suspend and
expel students is a power to determine students' continued
membership in the district community.  The Board also
waives high school graduation requirements in specific
cases, and bestows recognition on particular district
students.  The student board member's authority is subject
to the continued goodwill of the Board: under Board bylaws,
the Board delegates authority to the student, and any
authority the student has is "an exercise in student
responsibilities."  Unlike the legislative sessions in *Marsh*
and *Town of Greece*, where constituents may replace
legislators and need not fear their exercise of comprehensive
control, students do not enjoy such autonomy.

Moreover, legislators and constituents hold equal status
as adult members of the political community, which means
that in the ordinary course of events constituents may feel
free to exit or voice dissent in response to a prayer at a
legislative session.  Minors in the school district essentially
lack those options.  For student attendees, then, the school-
board meetings in which the prayer occurs, and the
relationship between students and the Board, lack the
democratic hallmarks present in legislative sessions and in
constituents' relationship with the legislature.

Further, academic and social pressures make students'
presence at the Board meetings not meaningfully voluntary.
Children attend the Chino Valley Board meetings pursuant
to academic or extracurricular obligations.  The student
representative on the Board, for instance, attends pursuant to
her duty to "provide continuing input for board

deliberations."[14]   Student presentations at meetings—such as presentations by sixth-grade students reading chapters from their autobiographies—expand on in-class educational activities.

Neither *Marsh* nor *Town of Greece* implicated the audience's access to, and experience of, a public-school education.  A requirement that a child choose whether to participate in a religious exercise or to dissent in order to participate in a complete educational experience, on par with that of her peers, implicates graver Establishment Clause considerations than the prayers at public meetings found to be within the *Marsh-Greece* tradition.  In sum, the nature of the audience at the Chino Valley Board meetings, and the nature of its relationship with the governmental entity making policy, are very different from those within the *Marsh-Greece* legislative-prayer tradition.

Beyond the factors specific to the Chino Valley Board meetings, prayer at school-board meetings cannot be understood as part of the historical tradition of legislative prayer identified in *Marsh* and *Town of Greece*.  The history of public schools in the United States, and their intersection with the Establishment Clause, does not support the application of the *Marsh-Greece* exception to the practices

---

[14] The Board asserts that the student representative is not required to attend—citing instances when the student representative missed meetings or left early.  This overly formalistic understanding ignores the nature of the student representative's duties, which require her to provide input to the Board.  The fact that the district does not physically force the student representative to be present at every meeting does not mean that she could miss *all* meetings and meaningfully fulfill her responsibilities as a student representative to the Board.  Because she cannot miss meetings while continuing to function in her role, her attendance "borders on compulsory."  *See Indian River*, 653 F.3d at 277–78.

of public school boards, including school-board prayer. *Marsh-Greece* analysis applies to "a practice that was accepted by the Framers" and that, consequently, was historically understood as consonant with the Establishment Clause. *Town of Greece*, 134 S. Ct. at 1819.

At the time of the Framing, however, "free public education was virtually nonexistent." *Aguillard*, 482 U.S. at 583 n.4. The Bill of Rights had not yet been incorporated, nor had its instrument of incorporation even been adopted. The Framers consequently could not have viewed the Establishment Clause as relevant to local schools' and school boards' actions. *See Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 6 (1947). "Even at the time of adoption of the Fourteenth Amendment, education in Southern States was still primarily in private hands, and the movement toward free public schools supported by general taxation had not taken hold." *Jaffree*, 472 U.S. at 80 (O'Connor, J., concurring).

Thus, *Marsh*'s "historical approach is not useful in determining the proper roles of church and state in public schools." *Aguillard*, 482 U.S. at 583 n.4. As *Aguillard* recognizes, historical practice cannot be "accepted by the Framers," *Town of Greece*, 134 S. Ct. at 1819, when it did not exist at that time. For this reason, the Third and Sixth Circuits have followed the logic of *Aguillard* and have held that a historical approach sheds no light on whether school boards' actions violate the Establishment Clause. *Indian River Sch. Dist.*, 653 F.3d at 281; *Coles*, 171 F.3d at 381 (finding "the unique tradition articulated in *Marsh* inapposite" in the context of "the school board . . . an integral part of the public school system"); *see also Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 588–89 (6th Cir. 2015) (reaffirming, post-*Town of Greece*, that "the pure historical approach is of limited utility" in the context

of the public schools and applying ordinary Establishment Clause tests to a county school board's decision to abolish an alternative school and instead contract for student education in a program at a private religious school).[15]  We follow the same approach here and decline to apply the *Marsh-Greece* historical framework for legislative prayer to an institution essentially unknown to the Framers—a public-school board.  We can make no inference as to whether the Framers would have approved of prayer at school-board meetings in any context, much less in the factual circumstances at issue here, given the lack of free universal public education in the late 1700s.

### C.  The Lemon v. Kurtzman Analysis

Instead of the legislative-prayer analysis, we apply the three-pronged Establishment Clause test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  The Chino Valley Board's prayer policy and practice fails the *Lemon* test and is therefore unconstitutional.

The *Lemon* test remains the dominant mode of Establishment Clause analysis.  *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1299 n.7 (9th Cir. 2015); *see also, e.g.*, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 958–59, 971–75 (9th Cir. 2011).

---

[15] *See also Mellen v. Bunting*, 327 F.3d 355, 370 (4th Cir. 2003) (declining to adopt the legislative-prayer approach in analyzing a pre-supper prayer at a state-run military college, in part on the ground that "public universities and military colleges . . . did not exist when the Bill of Rights was adopted"); *Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 828–29 (11th Cir. 1989) (citing *Aguillard* in declining to apply historical analysis to "invocations at school-sponsored football games . . . nonexistent when the Constitution was adopted" and instead using the *Lemon* test).

Under that test, a governmental practice "[f]irst . . . must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally . . . [it] must not foster 'an excessive entanglement with religion.'" *Lemon*, 403 U.S. at 612–13 (internal citation omitted) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664 (1970)).  "Context is critical when evaluating the government's conduct." *Johnson*, 658 F.3d at 972.

Our *Lemon* analysis is sequential.  That is, if the action fails the first prong of *Lemon*, we need not analyze prongs two and three.  *Aguillard*, 482 U.S. at 583–85.  We find that the Board's prayer policy and practice lacks a secular legislative purpose and therefore, under *Lemon*, violates the Establishment Clause.

The requirement of neutrality among religions, and "between religion and nonreligion," is at the heart of our Establishment Clause.  *See McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005).  Accordingly, government action violates the first prong of *Lemon* when the government's predominant purpose is to advance or favor religion.  *Id.*; *accord Trunk v. City of San Diego*, 629 F.3d 1099, 1107 (9th Cir. 2011).  A secular purpose for the action may not be "merely secondary to a religious objective," and it must "be genuine, not a sham." *McCreary Cty.*, 545 U.S. at 864.  We evaluate purpose from the standpoint of an observer cognizant "of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act."  *Id.* at 862 (internal quotation marks and citation omitted).  As such an observer, we possess a "reasonable memor[y]," cognizant of the "context in which [the] policy arose."  *Id.* at 866 (citation omitted).

The Board's prayer policy provides two purported secular purposes: "solemnization" of the Board meetings, and "acknowledg[ing] and express[ing] the Board of Education's respect for the diversity of religious denominations and faiths represented and practiced" among the district's residents.  Of these two purposes, the Board proffers the solemnization rationale as the key motivator. The first paragraph of the prayer policy states that it exists "in order to solemnize proceedings of the Board of Education."  Only at the very end, in stating that the policy "is not intended . . . to affiliate the Board of Education with, nor express the Board of Education's preference for, any faith or religious denomination," does the policy express the second goal of acknowledging religious diversity. Nevertheless, we examine both, with sensitivity to the interplay among expressed purposes.

In evaluating purpose, we regularly take into account the statements of governmental officials involved in a policy's enactment.  *See, e.g.*, *Aguillard*, 482 U.S. at 591–93; *Jaffree*, 472 U.S. at 64–65 (Powell, J., concurring).  As we examine the Board's proffered purposes for the policy in the context of litigation, we must keep in mind that, shortly after the adoption of the policy, a Board member publicly, at a Board meeting, described the Board's goal as the furtherance of Christianity.  An elected official's public statements directly contradicting the purposes that a policy or bill expresses on its face call into question those expressed purposes.  *See McCreary Cty.*, 545 U.S. at 863–64.

In light of the history of Christian prayer at Board meetings, endorsed by Board members, the prayer policy's provision for a solemnizing invocation does not constitute a permissible secular purpose.  In *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), the Supreme Court found that the school district's purported secular

purposes for the student-led invocation at the start of high-school football games—solemnization and free expression—did not pass muster under *Lemon*'s first prong. *Id.* at 310–15.  In its evaluation, the Court looked in part to the means-end fit between the policy's expressed purposes and its "approval of only one specific kind of message, an 'invocation.'"  *Id.* at 309.  Because other messages that were not invocations could equally well serve the expressed purposes, the policy's restriction of the message to an invocation made those expressed purposes suspect.

Here, too, Chino Valley's choice to restrict the opening message to an invocation belies the expressed purposes of the policy.  There is no secular reason to limit the solemnization to prayers or, relatedly, to have a presupposition in the policy that the solemnizers will be religious leaders.  Rather, these aspects of the policy point to a religious purpose.

Next, the Board's second expressed purpose of demonstrating respect for religious diversity also fails the secularity test for multiple reasons.  First, the means-end fit is off in that the policy does not capture all the religious diversity in Chino Valley.  The policy limits invited prayer-givers to religious leaders with established religious communities within the district's boundaries.  However, there are people of minority faiths living within the borders of the Chino Valley Unified School District whose faith lacks a sufficient critical mass to sustain an established community within the district's borders.  For instance, roughly two percent of California's population is Buddhist, two percent is Jewish, one percent is Mormon, one percent is Orthodox Christian, and one percent belong to religions besides Buddhism, Christianity, Islam, Hinduism, or

32 FREEDOM FROM RELIGION FOUND. V. CHINO VALLEY USD

Judaism.[16]  But, there are no religious communities from these traditions on the Board's list of eligible congregations.[17]  Far from highlighting the full range of religious diversity and beliefs, the invocation policy reinforces the dominance of particular religious traditions.

Second, the purpose of respecting religious diversity, to the extent that it does not encompass *non*religious belief systems and their diversity, is itself constitutionally suspect. Atheists and agnostics comprise four percent and five percent of the California population, respectively.[18]  Neither the purpose of respecting religious diversity nor the means of doing so via prayer acknowledges or respects the beliefs of nonreligious citizens in the district.  *Santa Fe ISD*, 530 U.S. at 309–10.  Hence, Chino Valley's failure to acknowledge nonreligious beliefs undermines the validity of the second putative secular purpose for its prayer policy.

While the lack of a secular purpose is sufficient to find the Board's policy and practice unconstitutional, the prayers in this appeal also fail the second and third prongs of the *Lemon* test.  *See* 403 U.S. at 612–13.  Under the second prong, the principal or primary effect of the prayers at the

---

[16] Pew Research Center, *2014 Religious Landscape Study: Adults in California*, http://www.pewforum.org/religious-landscape-study/state/california/.

[17] The school district's compiled list of congregations does not explicitly identify the religious affiliation of each community.  Four congregations on the list are highlighted, all of which are non-Christian: three are Muslim and one is Hindu.  The names of all other congregations suggest that they are various Christian denominations; none are identified as Orthodox or pertaining to the Church of Latter-Day Saints.

[18] Pew Research Center, 2014 Religious Landscape Study: Adults in California.

Board meetings cannot be said to "neither advance[] nor inhibit[] religion." *Id.* Instead, the prayers frequently advanced religion in general and Christianity in particular. Under the third prong, the Board's policy and practice fostered an "excessive government entanglement" with religion. *Id.* There are many ways besides prayer both to acknowledge the community's religious diversity and to solemnize the Board meetings. Readings about the import of religious diversity, the pluralistic nature of our society, or leaders from various religious (and explicitly nonreligious) traditions could provide for serious reflection, without conveying an explicitly religious message or performing a religious activity during the Board meeting. *See Santa Fe ISD*, 530 U.S. at 306. Hence, the means-end fit here is skewed in the same way that it was in *Santa Fe ISD*: an invocation is not necessary to accomplish these purposes.[19]

In sum, the existence of equally available secular means of accomplishing the Board's stated purposes, coupled with the history of Christian prayer, demonstrates that the prayer policy's purpose is predominantly religious in violation of the Establishment Clause.

## IV.    The Injunction

The district court enjoined the Board members "from conducting, permitting or otherwise endorsing school-sponsored prayer in Board meetings." The Board argues that this portion of the ordered relief is overbroad because it

---

[19] The Board argues that only a minority—two of the five Board members who adopted the prayer policy—engaged in overtly religious statements at Board meetings. However, a third Board member, at the time of the policy's adoption, prayed at meetings. Such public prayer is a "religious exercise." *Lee*, 505 U.S. at 586. Together, those three members constituted a majority of the Board.

requires the Board members to censor speech protected by the First Amendment. Its concern lies, particularly, with speech by members of the public during the public-comment portion of the Board meetings. The Board is in error: the judgment does not implicate protected speech and, consequently, does not give rise to First Amendment concerns.

"There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech," including in public fora. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995). Accordingly, we need not reach the question whether the public-comment portion of the Board meetings constitutes a public forum, a designated public forum, or, as the Board characterizes it, a limited public forum. The injunction satisfies the more exacting strict-scrutiny standard for a public or designated public forum. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001). It "is narrowly drawn to achieve" a "compelling state interest." *Id.* The only speech that it requires the Board members to refrain from engaging in or permitting others to engage in is speech that would cause the district to violate the Establishment Clause. Under state law, the Board has "control" of the school district. Cal. Educ. Code § 35010. Consequently, the Board members are appropriate actors to enjoin in order to bar *school-sponsored* prayer—including at the Board meeting.

Moreover, on at least one occasion, a Board member has given the opening prayer during the public-comment period of the meeting. It is therefore appropriate for the injunction to restrain Board members from acting during the public-comment period to further school-sponsored prayer, and to prevent others from giving the school's imprimatur to prayer

at that time.[20]  Although it is a content-based restriction on speech, the injunction is not overbroad because it is limited to restricting only speech that constitutes a governmental establishment of religion.  Such restriction does not violate but rather upholds the First Amendment.

## V.  Request to Vacate Part of the Judgment

The Board's notice of appeal encompasses the district court's judgment in its entirety.  We need not reach the Board's request to vacate the district court's judgment as it pertains to the Board's policy and practice of Bible reading, preaching, and prayer outside of the opening prayer because the Board has chosen not to argue the issue on appeal.[21]  This is waiver—the "intentional relinquishment or abandonment of a known right or privilege." *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 559 (9th Cir. 2016).  It is well established that an appellant's failure to argue an issue in the opening brief, much less on appeal more generally, waives that issue, with exceptions not relevant here.  *See, e.g.*, *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1019 (9th Cir. 2017) (issue not argued in briefs waived).[22]

---

[20] For example, as the Foundation notes, the injunction prevents the creation of a de facto opening invocation during the public-comment period.

[21] We grant the Board's motion for judicial notice as to Board Bylaw 9010.5, adopted November 3, 2016. The accuracy of the bylaw is undisputed.

[22] We may choose to review an issue notwithstanding waiver under certain circumstances, including where good cause is shown, where failure to review "would result in manifest injustice," where the appellee's brief raises the issue, and where failure to raise the issue did not prejudice the appellee. *See United States v. Ullah*, 976 F.2d 509, 514

The policy and practice of prayer at Chino Valley Board meetings violates the Establishment Clause.  The scope of injunctive relief is appropriate, because it merely prohibits governmental action that violates the Constitution and does not infringe upon constitutional rights.

**AFFIRMED.**

---

(9th Cir. 1992) (citation omitted).  The Board's appeal implicates none of these situations.