**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC., | No. 16-55425 |
| *Plaintiff-Appellee*, | D.C. No. 5:14-cv-02336-JGB-DTB |
| v. | |
| CHINO VALLEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION; JAMES NA, Chino Valley Unified School District Board of Education Board Member in his official representative capacity; SYLVIA OROZCO, Chino Valley Unified School District Board of Education Board Member in her official representative capacity; CHARLES DICKIE, Chino Valley Unified School District Board of Education Board Member in his official representative capacity; ANDREW CRUZ, Chino Valley Unified School District Board of Education Board Member in his official representative capacity; IRENE HERNANDEZ-BLAIR, Chino Valley Unified School District Board of Education Board Member in her official representative capacity, | ORDER |
| *Defendants-Appellants.* | |

2      FREEDOM FROM RELIGION FOUND. v. CHINO VALLEY USD

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted November 8, 2017
Pasadena, California

Filed December 26, 2018

Before:  M. Margaret McKeown and Kim McLane
Wardlaw, Circuit Judges, and Wiley Y. Daniel,* District
Judge

Order;
Opinion Respecting Denial by Judge O'Scannlain;
Dissent to Order by Judge R. Nelson

---

* The Honorable Wiley Y. Daniel, United States District Judge for
the U.S. District Court for Colorado, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel denied a petition for rehearing en banc on behalf of the court.  In the underlying opinion, the panel held that a school board's policy and practice of permitting religious exercise during board meetings, including a religious prayer at meetings that are open to the public and that include student attendees and participants, violates the Establishment Clause.

Respecting the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Rawlinson, Bybee, Callahan, Bea, Ikuta, Bennett and R. Nelson, stated that he believed that the court's refusal to rehear this case en banc was a needless mistake.  Judge O'Scannlain stated that the practice of Defendant-Appellant Chino Valley Unified School District Board of Education to begin its regular public meetings with prayer did not constitute an establishment of religion in any sense of that term.

Dissenting from the denial of rehearing en banc, Judge R. Nelson, joined by Judges Bybee, Callahan, Bea and Ikuta, and by Judge Bennett as to Part II, stated that he joined Judge O'Scannlain's statement respecting the denial of rehearing en banc; and that the panel opinion conflicts with the Supreme Court's decisions and Fifth Circuit precedent, and misapplies *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

## ORDER

The full court has been advised of the petition for rehearing en banc.  A judge requested a vote on whether to rehear the matter en banc.  The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration.  Fed. R. App. P. 35.

The petition for rehearing en banc is denied.

---

O'SCANNLAIN, Circuit Judge,*** with whom RAWLINSON, BYBEE, CALLAHAN, BEA, IKUTA, BENNETT, and R. NELSON, Circuit Judges, join, respecting the denial of rehearing en banc:

"In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." *Marsh v. Chambers*, 463 U.S. 783, 792 (1983).  So instructed the Supreme Court in upholding as constitutional the practice of the Nebraska Legislature of opening each legislative day with a prayer. "The Court has considered this symbolic expression to be a tolerable acknowledgement of beliefs widely held, rather than a first, treacherous step towards establishment of a state church." *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1818 (2014) (internal quotation marks and citation omitted).  And

---

*** As a judge of this court in senior status, I no longer have the power to vote on calls for rehearing cases en banc or formally to join a dissent from failure to rehear en banc.  *See* 28 U.S.C. § 46(c); Fed. R. App. P. 35(a).  Following our court's general orders, however, I may participate in discussions of en banc proceedings.  *See* Ninth Circuit General Order 5.5(a).

so *reaffirmed* the Supreme Court in upholding as constitutional the practice of a New York town board opening its monthly board meetings with a prayer.

Nonetheless, a panel of our court has now concluded that the practice of including prayer at the beginning of the open session of a public legislative body is a violation of the Establishment Clause[1] and is no longer constitutional. In doing so, the panel rejected the clear instruction of the Supreme Court and created a circuit split in the process. And today, the full court has failed to correct our own error.

With respect, I believe our court's refusal to rehear this case en banc is a needless mistake. The practice of Defendant-Appellant Chino Valley Unified School District Board of Education to begin its regular public meetings with prayer does not constitute an establishment of religion in any sense of that term.

I

First, a brief overview of the relevant facts. The Chino Valley Unified School District Board of Education ("Chino Valley" or "the Board") is the "governing" body that oversees all schools within the district. Cal. Educ. Code § 35010. As such, it is a legislative body. Cal. Gov't Code §§ 54951, 54952. The Board holds eighteen meetings per year, which may consist of both closed-session and open-session segments. *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1138 (9th Cir. 2018). During such meetings, typically held

---

[1] The Establishment Clause, characterized but not set forth in the panel's opinion, simply provides in full text as follows: "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I.

at the School District's office building, the Board governs by "conduct[ing] its business of making decisions regarding district administration." *Id.* at 1138.

The five Board members are elected at large by the qualified voters of the school district to serve four-year terms. Cal. Educ. Code § 35012. Under the California Education Code, the school district may—but need not— also appoint one or more "pupil members" to the Board to serve a one-year term. *Id.* For Chino Valley, such student representative to the Board has been the president of the Student Advisory Council, and may cast a preferential vote on matters during the open session. *Id.*; *Freedom From Religion*, 896 F.3d at 1139. The preferential vote does not actually factor into the final outcome of any vote by the Board. Cal. Educ. Code § 35012.

After a closed session during which the five adult Board members make decisions on student discipline, student readmission, and district employment matters outside the presence of the public or any student, the Board meeting moves into open session. *Freedom From Religion*, 896 F.3d at 1138. During the open session, the Board handles its general business of governing the district. *Id.* at 1138–39. There is also a public comment period following comments by a student representative and an employee representative. *Id.* at 1138. The open session may also include presentations by classes or students, or highlight the accomplishments of students. *Id.* The meeting closes with public statements by each of the adult Board members. *Id.* at 1139.

Since 2010, the Board has included prayer as part of its meetings "[i]n order to solemnize proceedings of the Board of Education." *Id.* at 1139, 1149. Pursuant to the Board's unanimously adopted policy regarding invocations at meetings, the prayer is delivered "by an eligible member of

the clergy or a religious leader in the boundaries of the district." *Id.* at 1139–40 (internal quotations omitted). Clergy are scheduled on a first-come, first-served, or otherwise random basis, and no one "may be scheduled to pray at consecutive meetings, or at more than three per year." *Id.* The Board invites clergy members and religious leaders to offer an invocation according to their own conscience in "a spirit of respect and ecumenism," but requests "that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different from that of the invocational speaker."

## II

The Supreme Court has long recognized the constitutionality of legislative prayer. In *Marsh*, the Court observed that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786. Yet, the Court explained, the practice of legislative prayer is constitutional not simply because it is longstanding, but also because such long historical practice demonstrates what the drafters were understood to have meant at the time of the Founding. *Id.* at 790. "Clearly the men who wrote the First Amendment Religion Clauses did not view . . . opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* at 788. Thus, the Court concluded, the Nebraska Legislature's practice of opening sessions with a chaplain—a Presbyterian clergyman for the previous sixteen years, paid by the public—offering a prayer in the Judeo-Christian tradition was constitutional. *Id.* at 793.

The Supreme Court recently reaffirmed the continuing vitality of such tradition as applied to a local setting in *Town of Greece*. "As practiced by Congress since the framing of the Constitution, legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *Town of Greece*, 134 S. Ct. at 1818. Thus, the Court held that the Constitution permits a town board to open its monthly meetings with prayer, even when such prayer is sectarian. *Id.* at 1815, 1820. In the process, the Court rejected arguments which sought to cabin the holding of *Marsh* and to distinguish the town's prayer practice from the long-recognized tradition of legislative prayer. *Id.* at 1815, 1820–21.[2] And the Court determined, the prayer practice was constitutional *despite* the fact that town board meetings, beyond their legislative function, could be "occasions for ordinary citizens to engage with and petition their government, often on highly individualized matters." *Id.* at 1845 (Kagan, J., dissenting (internal quotations omitted)). Such practice was constitutional *despite* the fact that the setting of a town board meeting may be "intimate," with "children or teenagers[] present to receive an award or fulfill a high school civics requirement." *Id.* at 1846 (Kagan, J., dissenting). Despite these features, the town board meeting "fit[] within the

---

[2] Indeed, the Court even explained that nonsectarian or ecumenical prayer is not required by the legislative prayer tradition. *Id.* at 1820–21 ("An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases."). Further, the town's prayer practice "[did] not coerce participation by nonadherents" by "creat[ing] social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor the prayer and will vote on matters citizens bring before the board." *Id.* at 1820, 1828.

tradition long followed in Congress and the state legislatures." *Id.* at 1819 (Kennedy, J., opinion of the Court). Nowhere did the Court limit such tradition specifically to Congress, state legislatures, or town boards. *Id.* at 1818–19.

### III

The panel in this case disparages such well-established precedent. It improperly concludes that "prayer at the Chino Valley Board meeting falls outside the legislative-prayer tradition" entirely. *Freedom From Religion*, 896 F.3d at 1142. Instead, the panel bizarrely transforms the Board meetings into a "school setting." *Id.* at 1145. Because the "meetings function as extensions of the educational experience of the district's public schools," the panel argues—without any legitimate support—that they are "inconsonant with the legislative-prayer tradition." *Id.*

This distinction is plainly flawed: the Board, as a governing body, exists in order to *legislate*—not in order to educate. Such a manufactured distinction cannot justify the panel's outright disregard for Supreme Court instruction and guidance. The panel's view of the legislative prayer tradition recognized by the Supreme Court is ominously narrow, and its conclusion is inconsistent with the Supreme Court's clear instruction that invocations may be offered before "legislative and other deliberative public bodies." *Marsh*, 463 U.S. at 786.

### A

Attempting to justify its unwarranted refusal to apply the legislative prayer tradition, the panel first notes "[t]he presence of large numbers of children and adolescents" as the distinguishing factor. *Freedom From Religion*, 896 F.3d at 1145. Surely, the mere presence of children in the

audience cannot erode the legislative nature of the Board's proceedings; nor can the presence of a student representative, voluntarily participating in legislative proceedings away from any classroom.

Furthermore, the Supreme Court has expressly upheld the practice of legislative prayer at town board meetings at which students are present. *See Town of Greece*, 134 S. Ct. at 1827. This is surely common for legislative bodies, which students visit on field trips to observe democratic proceedings, or in which students work or volunteer as government pages or other similar positions. Besides, how does the demographic of the audience on a given day alter the nature of a deliberative body's meeting? Does the panel mean to suggest that the legislative prayer tradition is constitutional on days when no student is present as a visitor, award recipient, or volunteer, but suddenly becomes unconstitutional on days when students are present? Presumably not. *See id.* at 1832 (Alito, J., concurring) (noting that there is not "anything unusual about the occasional attendance of students" at local town board meetings); *id.* at 1846 (Kagan, J., dissenting) (arguing that the Court should have distinguished the town board from the Nebraska legislature because of the intimate setting and audience, which included students).

Certainly, student attendance at Board meetings might be an informative experience—but, "the presence of students at board meetings does not transform this into a school-prayer case." *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 527–28 (5th Cir. 2017). Quite simply, a Board of Education meeting is not a "school setting," whether or not students might find some benefit in observing the proceedings. This is not a case of introducing prayer into the classroom, *see Engel v. Vitale*, 370 U.S. 421 (1962); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203

(1963); *Wallace v. Jaffree*, 472 U.S. 38 (1985), a graduation ceremony, *see Lee v. Weisman*, 505 U.S. 577 (1992), or a high school football game, *see Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000).   Yet, the panel's opinion is dripping with unrestrained urgency to insulate public school students from any hint of exposure to religion even *outside the classroom*.   Plainly, the Establishment Clause does not require such extreme measures. [3]   Contrary to the panel's account, this is a case of students voluntarily attending a civic proceeding away from school during which the Establishment Clause plainly permits the practice of an opening invocation.   *See Marsh*, 463 U.S. at 786 ("From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.").

## B

Second, the panel asserts that the legislative prayer tradition cannot apply because "public-school authorities"

---

[3] And, in the school-prayer context, the Supreme Court has warned:

> A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution.   We recognize that, at graduation time and throughout the course of the educational process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students.

*Lee*, 505 U.S. at 598–99 (internal citations omitted).   The panel goes far beyond such warning, insulating students from exposure to prayer even *outside* of the classroom.

are in "control of" students at the Board meetings.  *Freedom From Religion*, 896 F.3d at 1145.  What nonsense!

There is no more exercise of "control" over students during the school Board meetings here than in the town board meetings in *Town of Greece*.  School authorities do not exercise control over students *during* the Chino Valley Board meeting.  And, there is no suggestion that audience members—including any children in attendance—or the student representative are not free to leave the meeting early or to arrive late.  *See* 134 S. Ct. at 1827.  In fact, even the student representative is not required to attend the Board meetings, is not permitted to attend the closed-session meetings, and may come and go during the open session.

At bottom, the question should be one of purpose: why do these meetings exist?  Clearly, the Board exists to legislate school district policy, and their meetings are the means by which they do so; they do not occur in order to educate students in a controlled environment.  Students observing and engaged in Board meetings may well find some educational benefit to their attendance, as the panel suggests.  But this is the same possible educational value provided to students attending the town board meetings in *Town of Greece*, an open session of Congress, or any other legislative body—and such value does not render the legislative prayer tradition unconstitutional.

## C

Finally, the panel cursorily concludes that a historical analysis shows that an opening prayer at school board meetings does not fit within our nation's legislative prayer tradition.  *Freedom From Religion*, 896 F.3d at 1148 ("We can make no inference as to whether the Framers would have approved of prayer at school-board meetings in any context,

much less in the factual circumstances at issue here, given the lack of free universal public education in the late 1700s."). The panel's assumption that, because public education did not exist broadly at the time of the Founding, a legislative body overseeing a school district is not permitted to open with prayer is absurd.

Certainly, we must consider "whether the prayer practice [at issue] fits within the tradition long followed in Congress and the state legislatures." *Town of Greece*, 134 S. Ct. at 1819. The Supreme Court has explained that the legislative prayer tradition is not constitutional simply because of its "historical patterns." *Marsh*, 463 U.S. at 790. "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation." *Town of Greece*, 134 S. Ct. at 1819. Rather, such historical foundation illuminates what the drafters were understood to have meant and how the Establishment Clause applied to early practices. *Id.*; *see also Marsh*, 463 U.S. at 791 ("This unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged."). In keeping with the Framers' consideration of legislative prayer as "a benign acknowledgement of religion's role in society," *Town of Greece*, 134 S. Ct. at 1819, "the practice of opening sessions with prayer has continued without interruption" since the Founding. *Marsh*, 463 U.S. at 788. Thus, what is required for a legislative prayer practice to be constitutional is not an unbroken historical pattern of the precise practice at issue. In *Town of Greece*, for example, the town's prayer policy was only adopted in 1999, and, in *Marsh*, the practice began in 1855, prior to Nebraska's statehood. *Town of Greece*, 134 S. Ct. at 1816; *Marsh*, 463 U.S. at 790. All that is needed is simply for the practice to "*fit[] within the*

*tradition long followed.*"  *Town of Greece*, 134 S. Ct. at 1819
(emphasis added).

In fact, as our sister circuit has observed in considering
the applicability of the tradition, "dating from the early
nineteenth century, at least eight states had some history of
opening prayers at school-board meetings."  *Am. Humanist
Ass'n*, 851 F.3d at 527.   And, until the mid-twentieth
century, the use of public school facilities for religious
education of students and the practice of prayer in public
school classrooms were thought to be consistent with the
Establishment Clause.  *See McCollum v. Bd. of Educ. of Sch.
Dist. No. 71*, 333 U.S. 203, 210–11 (1948); *Engel*, 370 U.S.
at 424.  Such practices of *school* prayer have not "withstood
the critical scrutiny of time and political change," but the
practice of *legislative* prayer has.  *Town of Greece*, 134 S.
Ct. at 1819.  The Board's practice does not, as the panel
suggests, conclusively lie outside of such tradition.

The absence of public education in its current form at the
Founding does not preclude opening prayer at the meetings
of legislative bodies that govern school districts.  *Cf.
Freedom From Religion*, 896 F.3d at 1148.  At most, it leads
to the conclusion that "*Marsh*'s 'historical approach is not
useful in determining the proper roles of church and state *in
public schools*.'"   *Id.* (quoting *Edwards v. Aguillard*,
482 U.S. 578, 583 n.4 (1987) (emphasis added)).   But the
Board here does not impose prayer in a public school.  As
*Town of Greece* suggests, the specific purview of the
legislative body at issue—whether it be a state or local
governmental body—surely does not control the
constitutionality of the legislative prayer tradition.  *Cf.* 134
S. Ct. at 1845–49 (Kagan, J., dissenting).

The panel's attempt to draw such fine distinctions
between Supreme Court precedent and the case at hand is

unconvincing.   The Board is a legislative body, and its practice of opening meetings with a prayer—pursuant to a policy that closely mirrors the one approved to open town board meetings, *see Town of Greece*, 134 S. Ct. at 1816, 1827—falls within the legislative prayer tradition recognized by the Supreme Court.   The panel's conclusion that attendance of some students precludes the practice of legislative prayer cannot reasonably be squared with the Court's decision in *Town of Greece*.   Our court has failed regrettably in refusing to recognize such tradition and precedent.

## IV

The panel's refusal to follow *Town of Greece* also creates a new circuit split.   In contrast to the panel's decision, the Fifth Circuit has recognized the constitutionality of the legislative prayer tradition at school board meetings.

In *American Humanist Association v. McCarty*, the Fifth Circuit—the only other circuit to have considered the constitutionality of legislative prayer in the school board context in light of *Town of Greece*[4]—upheld as constitutional a school district's policy of inviting students to deliver invocations before monthly school board meetings.   851 F.3d 521, 523 (5th Cir. 2017).   Like the Chino Valley Board meetings, the school board meetings in *American Humanist Association* were open to the public,

---

[4] The panel relies heavily on *Doe v. Indian River Sch. Dist.*, 653 F.3d 256 (3d Cir. 2011), and *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369 (6th Cir. 1999).   Both of these cases were decided prior to *Town of Greece*, and therefore lacked essential guidance from the Supreme Court on the constitutionality of legislative prayer in a local setting.   We cannot be confident that such decisions endure as written in light of *Town of Greece*.

and frequently attended by students "to receive awards or for
other reasons, such as brief performances by school bands
and choirs." *Id.* at 524.  The Fifth Circuit determined that "a
school board is more like a legislature than a school
classroom or event," and "[i]n no respect is it less a
deliberative legislative body than was the town board" in
*Town of Greece*. *Id.* at 526.  The school board's invitation
to *students* to offer "expressions" at the beginning of
meetings in *American Humanist Association*, *id.* at 524, is,
of course, factually distinguishable from the Chino Valley
School District Board's invitation to *local clergy and adult
volunteers* to offer invocations at the beginning of the open
session.  But this distinction does not affect the common
setting: a school board meeting.  In fact, the policy of
identifying and inviting adults, rather than students, to offer
the opening prayer suggests that the Chino Valley legislative
prayer practice is even closer to the one upheld in *Town of
Greece* than that considered by the Fifth Circuit.  The school
board meetings considered by the Fifth Circuit are squarely
on point with the meetings at issue here, and we should have
followed the lead of our sister circuit.

V

The panel's stubborn contortion of the Board meetings
here into a "school setting" flies in the face of established
Supreme Court precedent.  We have been told twice by the
Supreme Court that the legislative prayer tradition is
constitutional, and yet we insist on false distinctions to avoid
the consequences of this conclusion.  Because the panel
failed faithfully to apply *Town of Greece* and *Marsh*, and
because such error has now created a circuit split, it is deeply
regrettable that this case was not reheard en banc.

R. NELSON, Circuit Judge, with whom BYBEE, CALLAHAN, BEA and IKUTA, Circuit Judges, join, and with whom BENNETT, Circuit Judge, joins as to Part II, dissenting from the denial of rehearing en banc:

I join Judge O'Scannlain's statement respecting the denial of rehearing en banc. The panel opinion conflicts with the Supreme Court's decisions in *Marsh v. Chambers*, 463 U.S. 783 (1983), and *Town of Greece v. Galloway*, 572 U.S. 565 (2014), and our sister circuit's opinion in *American Humanist Ass'n v. McCarty*, 851 F.3d 521 (5th Cir.), *cert. denied*, 138 S. Ct. 470 (2017). I write separately to address the panel's misapplication of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1148–51 (9th Cir. 2018).

I

The panel held that a nonsectarian prayer or invocation before the Chino Valley Unified School District of Education Board ("the Board") meeting violates the Establishment Clause under *Lemon*, 403 U.S. 602. This case is worthy of en banc review. *Cf. Paulson v. City of San Diego*, 294 F.3d 1124 (9th Cir. 2002) (en banc) (reversing panel decision and holding that sale of the City property including a Latin Cross was unconstitutional under the California constitution). Given the circuit split created and widespread effect the panel opinion may have on more than a thousand school boards throughout the Ninth Circuit (many open meetings with invocations or prayers), this court en banc should address the important Establishment Clause questions raised.

A

The Establishment Clause is ten words: "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Much jurisprudence has flowed under the Establishment Clause bridge over the last 227 years. In interpreting that precedent, however, the constitutional text and history is instructive.[1]

Forty-seven years ago, the Supreme Court adopted the three-factor test in *Lemon*, 403 U.S. at 612–13 (requiring that governmental practice "[f]irst . . . must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally [it] must not foster an excessive government entanglement with religion") (internal quotation marks and citations omitted).

Perhaps understating the issue, "the *Lemon* test has proved problematic," *Wallace v. Jaffree*, 472 U.S. 38, 68 (1985) (O'Connor, J., concurring), resulting in varying versions of the test, *see, e.g.*, *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989) (adopting the endorsement test); *Agostini v. Felton*, 521 U.S. 203, 218, 232–33 (1997) (folding the entanglement inquiry into the primary effect inquiry), and selective application of the test,

---

[1] *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 632-36 (1992) (Scalia, J., dissenting) (history of prayer in light of Establishment Clause); *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 49-52 (2004) (Thomas, J., concurring) (history of Establishment Clause related to incorporation); *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 869 (7th Cir. 2012) (Easterbrook, C.J., dissenting) ("The actual Establishment Clause bans laws respecting the *establishment* of religion—which is to say, taxation for the support of a church, the employment of clergy on the public payroll, and mandatory attendance or worship.") (emphasis in original).

*see, e.g.*, *Town of Greece*, 572 U.S. at 577 (not applying *Lemon*). The state of the *Lemon* test has left this court at times struggling for clear guidance. *See, e.g.*, *Card v. City of Everett*, 520 F.3d 1009, 1023–24 (9th Cir. 2008) (Fernandez, J., concurring) ("The still stalking *Lemon* test and the other tests and factors, which have floated to the top of this chaotic ocean from time to time in order to answer specific questions, are so indefinite and unhelpful that Establishment Clause jurisprudence has not become more fathomable.") (footnote omitted).

Because of its numerous shortcomings, *Lemon* has been criticized by members of the Supreme Court and others.[2] Although the Supreme Court declined to abandon *Lemon* (at least its purpose prong) in 2005, *see McCreary*, 545 U.S. at 863, recent cases provide good reason to question whether,

---

[2] *See, e.g.*, *McCreary Cty. v. ACLU*, 545 U.S. 844, 890 (2005) (Scalia, J., dissenting) ("a majority of the Justices on the current Court (including at least one Member of today's majority) have, in separate opinions, repudiated the brain-spun '*Lemon* test' that embodies the supposed principle of neutrality between religion and irreligion"); *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (questioning "the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence"); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring) ("Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the [*Lemon*] creature's heart (the author of today's opinion repeatedly), and a sixth has joined an opinion doing so."); *Elmbrook Sch. Dist.*, 687 F.3d at 869 (Easterbrook, C.J., dissenting) (*Lemon* standards "not only are hopelessly open-ended but also lack support in the text of the first amendment and do not have any historical provenance").

or at least to what extent, *Lemon* has been replaced, *see, e.g.*, *Town of Greece*, 572 U.S. at 577.[3]

## B

Twenty-five years ago, Justice Scalia compared the *Lemon* test to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried" with the effect of "frightening the little children and school attorneys of [the] School District." *Lamb's Chapel*, 508 U.S. at 398 (Scalia, J., concurring). In the ensuing decades, the *Lemon* ghoul (while largely ignored by the Supreme Court), has stalked the lower courts, no longer just frightening little children but increasingly devouring religious expression in the public square.

Even applying *Lemon*, the purpose prong (applied by the panel) should be a rather dull arrow in the Establishment Clause quiver. The secular legislative purpose prong is "seldom dispositive" under *Lemon*. *McCreary*, 545 U.S. at 859. And for good reason. The *Lemon* analysis, including the panel's sharp analysis of the purpose prong, tends to "ratchet up the Court's hostility to religion," *id.* at 900 (Scalia, J., dissenting), "exacerbat[ing] the tension between the Free Exercise and Establishment Clauses," *Edwards v.*

---

[3] Currently pending before the Supreme Court are two consolidated cases potentially addressing the contours of *Lemon* under the Establishment Clause. *See Am. Humanist Ass'n v. Maryland-National Capital Park & Planning Comm'n*, 874 F.3d 195 (4th Cir. 2017), and *Am. Humanist Ass'n v. Maryland-National Capital Park & Planning Comm'n*, 891 F.3d 117 (4th Cir. 2018), *cert. granted and cases consolidated sub nom. Am. Legion v. Am. Humanist Ass'n*, Nos. 17-1717, 18-18 (U.S. Nov. 2, 2018).

*Aguillard*, 482 U.S. 578, 640 (1987) (Scalia, J., dissenting). This general flexibility of the *Lemon* test has at times edged this court toward hostility to religion.[4]  By misapplying *Lemon*, the panel avoids the text, history and principles of the First Amendment's religion clauses.

## II

The panel wrongly holds that the "Board's prayer policy lacks a secular legislative purpose" under *Lemon*.  *Freedom From Religion*, 896 F.3d at 1143.  While this court has invalidated government action under *Lemon*, it has rarely done so under the secular purpose prong.  Not surprising, as the secular purpose prong "has not been fatal very often,

---

[4] *See, e.g.*, *Salazar v. Buono*, 559 U.S. 700 (2010) (reversing *Buono v. Kempthorne*, 527 F.3d 758 (9th Cir. 2008), and *Buono v. Kempthorne*, 502 F.3d 1069 (9th Cir. 2007)); *id.* at 726 (Alito, J., concurring in part and concurring in the judgment) (removal of cross might be interpreted "as an arresting symbol of a Government that is not neutral but hostile on matters of religion and is bent on eliminating from all public places and symbols any trace of our country's religious heritage"); *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011) (holding war memorial, including a Latin cross, violated Establishment Clause, after Justice Kennedy previously stayed removal of the cross), *cert. denied sub nom. Mount Soledad Mem'l Ass'n v. Trunk*, 567 U.S. 944 (2012) (Alito, J., Statement regarding denial of certiorari) (indicating willingness to consider case upon final order); *Mount Soledad Mem'l Ass'n v. Trunk*, 134 S. Ct. 2658 (2014) (Alito, J., Statement regarding denial of certiorari); *Newdow*, 542 U.S. 1 (reversing this court); *Gentala v. City of Tucson*, 244 F.3d 1065 (9th Cir.) (en banc) (upholding city's denial to provide services for National Day of Prayer gathering), *judgment vacated*, 534 U.S. 946 (2001) (vacating and remanding in light of *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)); *Garnett v. Renton Sch. Dist. No. 403*, 874 F.2d 608 (9th Cir. 1989) (holding allowing high school students to use classroom before school for religious meeting violates the Establishment Clause), *judgment vacated*, 496 U.S. 914 (1990) (vacating judgment and remanding in light of *Board of Education of the Westside Community Schools v. Mergens*, 496 U.S. 226 (1990)).

presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion." *McCreary*, 545 U.S. at 863. The panel ignores Supreme Court precedent and stretches this court's case law in invalidating the Board's prayer or invocation policy under *Lemon*'s secular purpose prong.

A

The Board expressed two secular purposes for the policy, both of which pass constitutional muster: (1) solemnizing the Board meetings and (2) supporting religious diversity. These stated secular purposes are generally entitled to deference absent a showing that they are "motivated *wholly* by an impermissible purpose" or are a sham. *Santa Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1300 (9th Cir. 2015) (emphasis in original) (internal quotation marks omitted). As this court has cautioned, a "reviewing court must be 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (quoting *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983)). The Board policy here is not the "unusual" case where the government purposes should be considered a sham. *McCreary*, 545 U.S. at 865.

To support its dismissal of the Board's first stated secular purpose, the panel relies on *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). *Santa Fe* is inapposite because the school board is a legislative body. *See* O'Scannlain Statement at 9–11. But the differences in context, forum, and facts between the practices and policies at issue in *Santa Fe* and those at issue here extend beyond the legislative context and establish legitimate secular purposes. *Santa Fe* involved a single student who was elected to a year-long position (previously called "Student

Chaplain") to solemnize each football game with a sectarian prayer. *Santa Fe*, 530 U.S. at 309, 315.

Here, by contrast, the Board did not restrict the opportunity to solemnize its meetings to one individual, but rather opened it to rotating members of the religious community and others.   The prayers and invocations occurred prior to the start of the meeting and were not included on the meeting minutes.  The Board policy provides that "a religious entity can write to the superintendent's designee to ensure that it is on the list" to give a prayer or invocation.   *Freedom From Religion*, 896 F.3d at 1139. Non-clergy, non-Christian religious leaders and private citizens have offered prayers or invocations under the Board's policy.  And there is no evidence that the Board excluded or denied an opportunity to any would-be prayer or invocation giver, whether atheists, plaintiffs or members of minority religions.  Finally, unlike in *Santa Fe*, the Board policy as adopted reflects the practice as originally adopted by the Board to allow nonsectarian prayers or invocations from a variety of viewpoints at Board meetings.

In finding a predominantly religious purpose, the panel relies on record evidence that does not bear on the purported purpose of the Board's prayer or invocation policy.  The Board policy contains no religious preference, and no statement regarding religious preference was made at the time the Board adopted the policy.  The panel relies on statements of individual Board members who did not author or sponsor the Board policy and which did not reference the Board's prayer or invocation policy.  More importantly, the statements by Board members relied upon by the panel were made a year *after* the policy was adopted.  *See Freedom From Religion*, 896 F.3d at 1140–41, 1149–50.   This extraneous evidence is not relevant to the legislative purpose of the Board policy, even under cases like *Edwards*, 482 U.S.

at 591–93, that suggest that a legislation *sponsor's comments at the time of enactment* may be relevant.

The Board's second expressed purpose of demonstrating respect for religious diversity also passes constitutional muster. Like the Town of Greece, the Board made reasonable efforts to identify eligible local religious leaders and compile a list by looking through a commercial phonebook, collating "research from the internet," and consulting with "local chambers of commerce." *Freedom From Religion*, 896 F.3d at 1139. Given the Board policy of nondiscrimination, "the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." *Town of Greece*, 572 U.S. at 585–86. Doing so would "require the town 'to make wholly inappropriate judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each,' a form of government entanglement with religion that is far more troublesome than the current approach." *Id.* at 586 (internal citation and brackets omitted).

These facts, neither individually, nor collectively, demonstrate that the Board's policy was motivated *wholly* by an impermissible purpose or was a sham to advance religion. The Board's stated secular purposes warrant due deference and satisfy the secular purpose prong under *Lemon*.

B

The panel also superficially, and wrongly, suggests that the Board's policy violates the second and third prongs of the *Lemon* test. *See Freedom From Religion*, 896 F.3d at 1151. As noted above, the prayers or invocations were inclusive of religious groups, including Hindu and Muslim

invocations, as well as private citizens.  Here, as in *Town of Greece*, the fact that "nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths."  572 U.S. at 585.

Rather than attributing the Board's limited list of eligible congregations to the religious demographics of the district (with express provisions providing for religious diversity in the policy), the panel assumes a constitutionally suspect reinforcement of dominant religious traditions.  *Freedom From Religion*, 896 F.3d at 1149.  In *Town of Greece*, the Supreme Court expressly rejected the Court of Appeals' view that the town "contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead the prayer."  572 U.S. at 585.

Moreover, no entanglement problem exists because there is no indication that the messages are expressly limited by the Board to prayers or invocations in a traditional sense. There is no evidence that anyone, whether atheists, plaintiffs, or religious minorities, asked to provide an invocation or prayer under the Board policy more consistent with their desired message.  Nor is there any evidence that the Board rejected the suggestion as the panel proposes, of allowing leaders from various religious or non-religious communities to provide for "serious reflection, without conveying an explicitly religious message."  *Freedom From Religion*, 896 F.3d at 1151.  Indeed, striking down the Board policy because it may presuppose a nonsectarian religious message, but allow other permissible messages, invites "the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid."  *Van Orden*, 545 U.S. at 704 (Breyer, J., concurring).

### III

Because, even if applicable, the panel's application of *Lemon* conflicts with precedent from the Supreme Court and this court, we should rehear this case en banc.  As such, I respectfully dissent.